160 N.J. Super. 193 (1978)
389 A.2d 490
ALBERT P. MARSH, M.D. AND MARSH RADIOLOGY PROFESSIONAL ASSOCIATION, APPELLANTS, AND THE MEDICAL SOCIETY OF NEW JERSEY, INTERVENOR,
v.
JOANNE E. FINLEY, MD., M.P.H., COMMISSIONER OF HEALTH OF THE STATE OF NEW JERSEY, RESPONDENT, AND STANLEY C. VAN NESS, PUBLIC ADVOCATE, STATE OF NEW JERSEY, INTERVENOR.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1978.
Decided June 15, 1978.
*194 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Burton L. Eichler argued the cause for appellants and intervenor The Medical Society of New Jersey (Messrs. *195 Brach, Eichler, Rosenberg & Silver, attorneys; Messrs. Eichler and Barry H. Ostrowsky on the briefs).
PER CURIAM.
Plaintiff Albert P. Marsh, a licensed physician specializing in radiology and conducting his business under the name of Marsh Radiology Professional Association (both hereafter called "plaintiff"), appeals from a ruling of defendant Joanne E. Finley, M.D., Commissioner of Health of New Jersey, which determined that plaintiff's impending purchase of Computerized Axial Tomography (C.A.T.) equipment for his private office constituted "the operation of a health care facility subject to the certificate of need requirement of the Health Care Facilities Planning Act."
Plaintiff's complaint filed in the Chancery Division which challenged said ruling was transferred to this court on the ground that plaintiff sought a review of the action of a state administrative officer. R. 2:2-3(a) (2). The Medical Society of New Jersey has intervened as a party-plaintiff and the Public Advocate has intervened as a party-respondent.
In her letter of May 21, 1976 announcing her ruling the Commissioner stated:
The cost of acquiring such units ranges from $350,000 to $550,000 and, after site preparation, from $400,000 to $600,000. In addition, operational costs, depending upon the number of procedures performed range from $290,000 to $301,500 per year. This includes extensive technical and professional staff necessary to operate the equipment and perform the diagnostic procedures associated with this equipment.
Because of the large expense associated with purchasing and operating a computerized axial tomography equipment and extensive staffing necessary to conduct the diagnostic procedures for which this equipment is used, I conclude that the acquisition of such equipment constitutes the construction of a health care facility within the meaning of the Health Care Facilities Planning Act. Accordingly, I hereby conclude that prior to obtaining this equipment you must obtain a certificate of need as provided under N.J.S.A. 26:2H-7.
*196 While this appeal was pending the matter was remanded to the Commissioner for consideration of newly adopted regulations purporting to set forth criteria for determining whether a particular modality of health care delivery is a health care facility within the meaning of the Health Care Facilities Planning Act (hereafter the "Act"). N.J.S.A. 26:2H-1 et seq. Jurisdiction was retained. The Commissioner requested certain information from plaintiff's attorney concerning his proposed use of the C.A.T. scanner. The Commissioner received no response and subsequently filed her findings and conclusions wherein she iterated her conclusion that plaintiffs proposed project constituted the operation of a health care facility subject to the certificate of need requirements of the act.
On appeal Marsh contends that the Commissioner's authority to issue a certificate of need does not extend to a physician's private practice. More specifically, he contends that the act applies only to institutional facilities and does not authorize the Commissioner to regulate the services provided by a physician in his private practice such as plaintiff herein. We agree and reverse.
N.J.S.A. 26:2H-2(a) broadly defines a "health care facility" as follows:
"Health care facility" means the facility or institution whether public or private, engaged principally in providing services for health maintenance organizations, diagnosis or treatment of human disease, pain, injury, deformity or physical condition, including, but not limited to, a general hospital, special hospital, mental hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, home health care agency, boarding home or other home for the sheltered care of adult persons and bioanalytical laboratory or central services facility serving one or more such institutions but excluding institutions that provide healing solely by prayer.
On February 23, 1977 the State Department of Health promulgated a regulation, codified as N.J.A.C. 8:31-6.1, *197 setting forth various criteria for determining what shall constitute a health care facility. The regulation specifically provides that the Commissioner "shall determine whether a proposed or existing system or modality of health care delivery constitutes the operation of a health care facility." However, notwithstanding the authority accorded the Commissioner under the regulation, it is well established that "[a]n administrative agency may not under the guise of interpretation extend a statute to include persons not intended, nor may it give the statute any greater effect than its language allows." Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528 (1964); Hotel Suburban System v. Holderman, 42 N.J. Super. 84, 90-91 (App. Div. 1956). Hence, our first task is to ascertain the meaning of the act.
In interpreting statutory language the function of the court is to effectuate the intention of the Legislature. In this regard the court may consider the legislative policy underlying the statute and "any history which may be of aid." State v. Madden, 61 N.J. 377, 389 (1972); Matawan v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299 (1968).
The Act was enacted in 1971. Its legislative history clearly demonstrates that its purpose was to regulate and control the cost of "institutional" health care and that there was no intent to regulate the private practice of medicine by a physician.
The act was introduced as Senate Bill 2088 (1971) and the Statement thereon begins:
Public concern over the spiraling costs of institutional health care has resulted in demands for increased governmental scrutiny in the form of added regulation over the construction of health care facilities, the provision of services and operating costs of health care institutions. [Emphasis supplied]
The reference to "institutions" permeates the Statement. And at a public hearing before the Senate Committee on Institutions and Welfare on Senate Bill 330  the predecessor of Senate Bill 2088  Senator Wayne Dumont, Jr., sponsor *198 of both bills, noted that several bills regarding Blue Cross rates which had then recently passed the Senate "are bills designed as a package, along with S. 330 and four other bills that still remain in the Senate Insurance Committee on subrogation and liens, to help stem the rising cost of hospital care in New Jersey * * *." Senator Dumont's presentation clearly demonstrates that the bill was directed to institutions such as hospitals and nursing homes (public hearing on S. 330 held March 25, 1970, at 2-3). To the same effect was the testimony of Assemblyman Joseph Azzolina, sponsor of Assembly Bill 200 (1969), another predecessor of S. 2088 (public hearing on A. 200 and S. 301 before the Senate Committee on Institutions and Welfare, held May 2, 1969, at 56).
Finally, the act as adopted clearly evinces its objective of control over institutions such as hospitals and like facilities. Thus, N.J.S.A. 26:2H-1, setting forth a declaration of policy, declares:
It is hereby declared to be the public policy of the State that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health. In order to provide for the protection and promotion of the health of the inhabitants of the State, the State Department of Health, which has been designated as the sole agency in this State for comprehensive health planning under the "comprehensive Health Planning and Public Health Services Amendments of 1966" (Federal Law 89-749), as amended and supplemented, shall have the central, comprehensive responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services, and all public and private institutions, whether State, county, municipal, incorporated or not incorporated, serving principally, as boarding, nursing or maternity homes or other homes for the sheltered care of adult persons or as facilities for the prevention, diagnosis, or treatment of human disease, pain, injury, deformity or physical condition, shall be subject to the provisions of this act. [Emphasis supplied]
Further, as noted earlier, N.J.S.A. 26:2H-2(a) defines "health care facility" in language that cannot fairly be read *199 to apply to a physician's private practice. And the intent to exclude such facility is emphasized in the definition of "health care service" in N.J.S.A. 26:2H-2(b):
"Health care service" means the preadmission, out-patient, in-patient and post-discharge care provided in or by a health care facility, and such other items or services as are necessary for such care, which are provided by or under the supervision of a physician for the purpose of health maintenance organizations, diagnosis or treatment of human disease, pain, injury, disability, deformity or physical condition, including, but not limited to, nursing service, home care nursing and other paramedical service, ambulance service, service provided by an intern, resident in training or physician whose compensation is provided through agreement with a health care facility, laboratory service, medical social service, drugs, biologicals, supplies, appliances, equipment, bed and board, but excluding services provided by a physician in his private practice or by practitioners of healing solely by prayer, and services provided by volunteer first aid, rescue and ambulance squads as defined in the "New Jersey Highway Safety Act of 1971," P.L. 1971, c. 351. [Emphasis supplied]
Clearly then, a physician's private practice is excluded from certificate of need requirements. The service to be rendered by plaintiff with the C.A.T. scanner does not require him to obtain such a certificate. The decision of the Commissioner herein ignores the plain legislative intent as expressed in the act.
Further, it is a well established tenet of statutory construction that the "internal sense" of a statute must govern the interpretation of particular words and phrases. Loboda v. Clark Tp., 40 N.J. 424, 435 (1963). Therefore, respondent's reference to the terms "dispensary" and "out-patient clinic" in the definition of "health care facility" as authority for construing the statute to include a private medical practice is unconvincing. That construction belies the history and intent of the Act. Also, the doctrine of ejusdem generis would lead one to conclude that that construction is unwarranted. See 2A Sutherland, Statutory Construction (4 ed. 1973), § 47.17. The other facilities referred to in the act include hospitals, nursing homes, laboratories *200 and diagnostic and treatment centers. Each facility thus included has an institutional and structural identity very different from that of a physician's practice.
In the case at bar plaintiff's practice, even with the addition of the scanner, remains essentially a private practice. His practice does not involve merely the provision of facilities for medical diagnosis and treatment, as in a hospital or other institutional facility, but the actual diagnosis and treatment of patients seeking his aid. Plaintiff's practice and the tools he uses are inseparable. The scanner will apparently be only one of many diagnostic tools which are incidental to his specialty of radiology. The Commissioner's construction of the Act suggests that a radiologist must obtain a certificate of need for every costly radiological tool he may use. In our judgment such construction would distort the legislative intent.
Also, respondent's argument that a scanner located in a private office might siphon patients away from utilizing hospital scans, thus raising costs for the hospital, is unconvincing under the present legislative scheme. Such an argument must be addressed to the Legislature.
It is, of course, true that an administrative agency's interpretation of the statute it is charged with enforcing is entitled to great weight. In re Application of Saddle River, 71 N.J. 14, 24 (1976); In re Tomarchio, 148 N.J. Super. 99, 101 (App. Div. 1977). However, at the same time, "a court is bound to override an administrative construction where it is clearly contrary to the plain meaning of the statute." Service Armament Co. v. Hyland, 70 N.J. 550, 552 (1976).
The decision of the Commissioner requiring that plaintiff apply for and obtain a certificate of need in order to acquire and use the C.A.T. scanner is reversed.