192 N.J. Super. 44 (1983)
469 A.2d 65
WOMEN'S MEDICAL CENTER AT HOWELL, NORTH JERSEY GYNECOLOGICAL CENTER, INC., CHERRY HILL WOMEN'S CENTER AND NORTH JERSEY GYNECOLOGICAL CENTER, P.A., APPELLANTS,
v.
JOANNE FINLEY, M.D., M.P.H., NEW JERSEY COMMISSIONER OF HEALTH, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1983.
Decided November 17, 1983.
*47 Before Judges BOTTER, PRESSLER and O'BRIEN.
Burton L. Eichler argued the cause for appellant Women's Medical Center at Howell (Brach, Eichler, Rosenberg, Silver, Bernstein & Hammer, P.A., attorneys; H. Neil Broder and Burton L. Eichler, of counsel; Dean A. Kant and H. Neil Broder, on the brief).
Bruce H. Snyder argued the cause for appellants North Jersey Gynecological Center, Inc., North Jersey Physicians Management Corp., and Cherry Hill Women's Center (Lasser, Hochman, Marcus, Guryan and Kuskin, attorneys; Sheppard A. Guryan and Bruce H. Snyder, on the brief).
Steven J. Silver argued the cause for appellant North Jersey Gynecological Center, P.A. (Gruen and Ritvo, attorneys; Robert D. Gruen, of counsel).
Charlotte Kitler, Deputy Attorney General, argued the cause for the respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Deborah T. Poritz, Deputy Attorney General, of counsel).
The opinion of the court was delivered by PRESSLER, J.A.D.
The New Jersey Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 et seq., excludes from its definition of those health care facilities subject to its regulatory ambit "services provided by a physician in his private practice." N.J.S.A. 26:2H-2(b). "Private *48 practice" is not, however, defined either by the Act or its implementing regulations. These consolidated appeals involve three separate gynecological and obstetrics practices, each conducted by a group of three physicians, each offering first trimester abortion services as well as gynecological care and each conducted in physical circumstances indistinguishable from those commonly understood to constitute the offices of private practitioners. The issue raised by this appeal is whether these medical practices have forfeited their right to private-practice status and hence exemption from the Act by reason of the fact that each has contracted with a management corporation for the provision of a full range of non-professional office management services.
Following a hearing, the administrative law judge filed an initial decision concluding that these contracts did not alter the essential private-practice character of the three professional undertakings. The Commissioner disagreed, concluding that all three were health care facilities subject to the certificate of need and licensing requirements of the Act. The three management corporations appeal, and we reverse.
The facts respecting the conduct of these practices are essentially the same as to each and are not in substantial dispute. Illustratively, the practice known as Cherry Hill Women's Center is conducted by a professional corporation, KGD Ob-Gyn Associates (KGD), whose members are three physicians licensed to practice in New Jersey: Richard Sol Glick, Alan Kline and George Dainoff. These physicians also have a private office in Philadelphia and are employed as well at a licensed clinic in Philadelphia. The services they render in Cherry Hill consist of first trimester abortions and routine gynecological care. During the first three months of 1979, an average of approximately 175 abortions per month were performed. The Cherry Hill offices contain a lobby, a laboratory room, an examination room, a sterilizing room, a dressing room and bathroom, two procedure rooms, a physician's office, a general management office, a recovery room, a staff lounge and two counselling rooms.
*49 KGD, when it first began its New Jersey practice, contracted with Cherry Hill Women's Center (Cherry Hill), a New Jersey corporation, for office management services. Entitled "Leasing and Administrative Services Agreement," the contract describes Cherry Hill as engaged in the business of providing physicians with medical offices, equipment, supplies, and administrative services and personnel and expressly disclaims Cherry Hill's engagement either generally or in respect of its arrangement with KGD "in the practice of medicine, nursing or any other professional service nor in the operation of a hospital or laboratory." Cherry Hill further undertakes "not to exert any control or supervision over the exercise by KGD Associates of the medical and surgical judgment and their rendering of professional services" and stipulates that while it will assist the physicians in obtaining such professional assistants as nurses, technicians, and counselors as KGD may require, nevertheless any such professional employees shall be under KGD's "employ, control and supervision" and KGD shall "be responsible for any additional orders, explanations, supervision and/or training" of any professional assistants. As to administrative and non-professional services required in the conduct of the practice, Cherry Hill's undertaking is to provide whatever is necessary, including "but not limited to: billing and collection from patients of physician's fees, administration of payroll and compensation of physician's assistants and employees, upkeep and maintenance of office space and utilities, ordering and purchase of equipment and supplies, storage of medical and other records, and payment of accounts payable as well as collection of accounts receivable."
In respect of the financial relationship between the physicians and the management corporation, the agreement provides as follows:
7. The parties agree that there shall be no illegal or unethical division of physician's fees, and that any sums collected for KGD Associates by the Cherry Hill Women's Center from a patient for the physician's professional services shall be the property of KGD Associates, ab initio.
8. KGD Associates agrees to pay the Cherry Hill Women's Center a sum to be agreed upon from time to time for use of the premises, equipment, supplies *50 and administrative services. Amounts due to the Cherry Hill Women's Center from KGD may be withheld by the former from sums collected on behalf of and for the latter.
With respect to the conduct of the practice pursuant to the agreement, it was the undisputed testimony of Dr. Glick that the contract adequately and correctly describes KGD's relationship with Cherry Hill as well as the operation of the center. In short, all medical judgments are made by or under the control and supervision of the physicians and the management company does not either directly or indirectly influence medical decisions. The physicians themselves determine whether or not to perform particular office procedures on particular patients, what protocols are to be followed in emergencies, and how many patients are to be seen. Patient records are owned and maintained by them. They cover the office nine days in every two-week period and are always on call for emergencies. In the absence from the office of all physicians, only general administrative work and some continuing counselling is performed.
The center employs an administrator, a receptionist, two medical assistants, one registered nurse and two licensed practical nurses. All employees work under the direct supervision and control of the physicians, who also retain the right to insist on the firing of unsatisfactory personnel. The counselors, also under the physicians' supervision, work pursuant to a written protocol established by the doctors. The office equipment is owned by the management company, which also leases the premises. The physicians make no capital investment in the office.
Patient fees are paid to Cherry Hill and deposited to its account. Only it has the authority to draw on that account. It pays all expenses and issues weekly checks to the physicians, providing them with year-end 1099 forms. It also maintains all financial records and periodically prepares cost-analysis reports for the physicians' inspection. It is, however, the physicians who prepare the fee schedules and they do so based on the fees charged in their other office. At the time of the hearing, the *51 standard fee for a first trimester abortion was $195, but that fee is reduced to $125 in the case of indigent patients. Management fees are determined in accordance with the agreement by means of annual negotiations. Based on KGD's experiences at its other office, it projects the profit per procedure after deduction of overhead and all other expenses, and this is the amount drawn by the doctors.
Patients come to the center through referrals from other physicians, social agencies, other patients and advertising which is done in newspapers, brochures and the yellow pages of the telephone directory. Ordinarily the advertisements do not carry the physicians' names, referring only to the center.
At the Women's Medical Center at Howell (Howell), management services of the nature provided by Cherry Hill are furnished by Women's Medical Center, a Florida corporation registered in New Jersey. These services were originally provided to a Dr. Mitoko, who returned to Kenya early in 1979. The practice was temporarily taken over by a Dr. Pelosi, but ultimately a new contract was entered into between the management corporation and three physicians: Dr. Sheldon Turkish, Dr. John Burger and Dr. Richard Glick. It was Dr. Turkish's testimony that Dr. Mitoko had originally asked him to cover for him while he was in Kenya. These two physicians knew each other and had previously worked together. When it appeared that Dr. Mitoko would be unable to return from Kenya, Dr. Turkish and his two physician partners decided to take over the Howell practice. They retain the same management company, which was already servicing another of their offices in Edison. Dr. Turkish further explained that since he started in private practice in 1968 there had been a substantial increase in the amount of administrative detail and paperwork required by private physicians which ultimately consumed an inordinate amount of his time. He also testified that there was no material significance in terms of the professional aspects of the practice in the hiring of an outside management company as opposed to hiring "in-house" administrative personnel and he regards the *52 Howell office as his private practice. In any event, he executed an agreement with Women's Medical Center similar in provision and import to the Cherry Hill contract, and the conduct of the Howell practice is not materially different from the Cherry Hill practice.
As to the third of the practices here involved, it appears that in 1978 a Dr. Richard Bodner retained the services of North Jersey Gynecological Center, Inc., pursuant to an agreement similar to those used for the Cherry Hill and Howell practices. During the pendency of these proceedings Dr. Bodner terminated his arrangements with that management company and relocated his office. The original premises were taken over by a professional corporation, North Jersey Gynecological Center, P.A., consisting of three physicians: Dr. A.B. Clachko, Dr. Mark Clachko and a Dr. Bernstein. The professional corporation itself leased the office premises and entered into a management and administrative services contract with North Jersey Physicians' Management Corp. That contract is substantively the same as the other management contracts referred to, and the conduct of the practice does not materially differ from the conduct of the other two.
Based on this factual complex, the administrative law judge concluded that the three practices were private practices exempt from the Act. Recognizing that the Act itself does not define private practice, he resorted first to N.J.A.C. 8:31-6.1, the only regulation germane to the Commissioner of Health's determination of whether a "modality of health care delivery constitutes the operation of a health facility" subject to the Act. Section (c) of that regulation provides as follows:
Those factors which shall be considered as relevant to the determination of a health facility, and whether it has a significant impact upon health care delivery, shall include but not be limited to:
1. The type of health care service delivered and its potential effect on the health care delivery system;
2. The apparent costs of equipping, staffing and operating the health care service and the resultant cost to all payors and consumers of health care;

*53 3. The degree of complexity in terms of medical technology, equipment, and the medical, paramedical and administrative staffing required to provide the health care service;
4. The proposed or existing patterns of referral of persons to be provided health care by and to the service entity in question, and other providers of such care;
5. The financial arrangements for the payment or reimbursement of health care services available to both the service entity in question and to those persons receiving such care.
It was his conclusion that none of the enumerated factors suggested that these practices were properly classifiable as health care facilities. He explained that:
As to subparagraph 1, it is clear from the findings that the services delivered here are of the sort which could easily be provided in what would unquestionably be a physician's office. The potential effect on the health care delivery system could hardly be disruptive for that reason.
As to subparagraph 2, I have found that the cost of providing the services through the centers is substantially lower than the cost of providing the services through the hospitals.
As to subparagraph 3, the degree of complexity of the services is, again, well within the range of simple procedures which can appropriately be performed in a physician's office.
As to subparagraph 4, there is little in evidence concerning referral patterns, except to indicate that some referrals come from social agencies, while other referrals are "off the street." This in turn reinforces the perception that we are not dealing with centers which provide services of a complexity requiring hospitalization.
As to subparagraph 5, the financial arrangements for payment, the health care services do not in themselves in any way suggest that the services are provided in a health care facility.
The administrative law judge next considered four additional factors suggested by the Department of Health as bearing upon the classification issue, namely, establishment and investment in the operation, the degree of professional control over the operation, the physicians' opportunity for profit and loss, and public identification. He concluded that application of these criteria did not affect the private-practice character of the three centers. It was essentially his determination that as long as full professional control was maintained by the physicians, their resort to outside management companies for administrative, management and non-professional services, and indeed their acceptance, if that were the case, of a prepackaged office set-up, did not *54 implicate or invoke any of the policies or purposes of the Act such as would justify classifying their operations, on that basis alone, any differently from those private practices which provide for these services in more traditional ways. He thus summarized his reasons for rejecting the Department's contention as follows:
The most important reason is the fact that facility status attaches according to the nature of the transactions within the modality. While it may well be that the owners of petitioner played a pivotal role in securing the facilities and, indeed, in encouraging physicians to practice, the role played by the petitioners is constrained by the contracts they have signed. I would be amenable to listening to evidence suggesting that the contracts were a subterfuge, but there is no such evidence. To this end, it strikes me that the fact that there was capital investment in the operation by someone other than the physician does not undermine the status of the practice as that of a physician's private office.
* * * * * * * *
In the final analysis, the primary characteristics which distinguish a physician's office from a health care facility are the degree of control exercised by the physician and the nature of the procedures undertaken at the place of business. While there is certainly an area for speculation in any case, the evidence presented and the facts found indicated that at present the physicians who practice medicine at the centers do so in complete control of all medical aspects of the centers' activity. I am particularly struck by the testimony of Dr. Clachko with respect to the differences between his practice at the center and the practice at a hospital. He determines who are accepted as patients, he is solely responsible (together with his partners) for the exercise of all medical judgments and he has complete control over the scheduling of procedures. In these matters, he is assisted by the management corporation. With respect to the competent evidence and the findings in this case, it is the physician who asserts complete control.
This control would be of no relevance if the procedures carried out by the physician were of questionable medical judgment, that is to say, if they were so complicated that they required either hospitalization or the support of a free standing clinic. Nevertheless, the findings in this case have consistently been that the only procedures performed are first trimester abortions and other services involved in routine gynecological care.
The Commissioner rejected the administrative law judge's conclusions, not, insofar as we understand her final decision, because she disagreed with his factual findings but because of her variant interpretation of the operative facts. Her expressed concern was the potential for ethical violation inherent in the apparent ease of transfer of the practices and in the fee arrangements *55 between the physicians and the management companies. But her ratio decidendi, as it were, appears to be based on her perception that even though the physicians had retained professional control over the operation and conduct of their respective practices, there was nevertheless "a definite possibility" that their medical judgment might be subject to the influence of the management companies. As she articulated this concern,
Indeed, because of the substantial influence the management firm can exert over the entire fabric of the operation, there is the definite possibility that the firm can affect the physician's medical judgment. One possibility that springs immediately to mind is that the physician could be exhorted to perform more abortions at a quicker pace than he might deem proper in order to increase the amount of compensation to the firm from the number of fees. It is that possibility  and not any probability or even the actuality of improper effect upon medical judgment. .. .
Placing heavy emphasis on the fact that the centers' advertisements referred to themselves in "facility terms," she concluded that,
Accordingly and for the reasons stated above, I find that the preliminary determinations made by Dr. Finley are valid. As stated in each of her determination letters, the strong role of the management firm in the operation of the Centers, its position to serve as the continuing focus of the service despite the cancellation of contracts with the physician, and its ability to affect the physician's determination of the care provided to patients distinguish this health care modality from the private practice of medicine. Accordingly, I conclude that the three Centers are health care facilities subject to the provisions of the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 et seq.

We recognize that the administrative agency's interpretation of the legislation it is responsible for enforcing and implementing is entitled to some weight. See, e.g., Medcor, Inc. v. Finley, 179 N.J. Super. 142, 145 (App.Div. 1981); Infocomp Corp. v. Somerset Trust Co., 165 N.J. Super. 382, 391 (App.Div. 1979). That interpretation, however, is not binding on an appellate court. See, e.g., Marsh v. Finley, 160 N.J. Super. 193, 200 (App. Div. 1978), certif. den. 78 N.J. 396 (1978). And see Zigmont v. Teachers' Pension, etc. Fund Trustees, 182 N.J. Super. 50, 54 (App.Div. 1981), rev'd on other grounds, 91 N.J. 580 (1983). It is our conclusion that in the context of the factual complex here *56 the Commissioner's statutory interpretation is not supported by the plain language of the Act or its underlying purposes and policies. Accordingly, we are constrained to reverse her determination.
As we pointed out in Marsh v. Finley, supra, 160 N.J. Super. at 197-199, the Act was adopted in response to a growing concern over the rising cost of hospital care and, consequently, hospitalization insurance, in this state. It is essentially cost-containment legislation focusing on the institutional delivery of health care services. It never intended to regulate or control either the cost or manner of delivery of services provided by the private practice of medicine by physicians outside an institutional setting. Thus, as we noted in Marsh, the "reference to `institutions' permeates the statement" accompanying the Senate Bill, S2088 (1971), by which the Act was introduced. That statement reads in full as follows:
Public concern over the spiraling costs of institutional health care has resulted in demands for increased governmental scrutiny in the form of added regulation over the construction of health care facilities, the provision of services and operating costs of health care institutions. While continued leadership of the voluntary sector is vital in protecting quality of care and encouraging innovation in medical technology, the need for a legislative base to oversee and protect against unnecessary duplication of facilities and services and to moderate operating costs has been generally recognized.
This bill responds to the findings and recommendations expressed by the public defender in the 1969 rate application of Blue Cross in New Jersey and its predecessor cost study agencies including the Joint Legislative Committee constituted by both Houses of the Legislature in 1960 and the recent report of the Governor's Management Commission. It follows in the pattern already enacted in several states, and would provide governmental supervision of the critical areas of facilities planning and cost regulation to assure New Jersey citizens that institutional health care costs are in proper relationship to the need for quality health care.
In the matter of licensing institutions the bill would utilize the already established planning system. The bill would also integrate and supplement the present regulatory authority of the Department of Institutions and Agencies, the State Health Department and the Commissioner of Insurance over the matters of licensure, quality standards and rates to be paid by Blue Cross subscribers and payments to hospitals, by authorizing the State Department of Health to establish uniform accounting, reporting and audit procedures applicable to health care institutions.
*57 And see the legislative history referred to in Marsh v. Finley, supra, where we concluded that:
* * * the act as adopted clearly evinces its objective of control over institutions such as hospitals and like facilities.
* * * * * * * *
Further, as noted earlier, N.J.S.A. 26:2H-2(a) defines "health care facility" in language that cannot fairly be read to apply to a physician's private practice. And the intent to exclude such facility is emphasized in the definition of "health care service" in N.J.S.A. 26:2H-2(b). [160 N.J. Super. at 198-199]
See also, emphasizing the cost-containment underpinnings of the Act, N.J. Ass'n of Health Care Facilities v. Finley, 83 N.J. 67, 78 (1980); Borland v. Bayonne Hospital, 72 N.J. 152, 158 (1977), cert. den. 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977). It appears clear to us, therefore, that the Act, on its face, as a matter of its legislative history, and as implemented by regulation and particularly by N.J.A.C. 8:31-6.1, was intended primarily, if not exclusively, to contain the escalating costs of institutional delivery of health care. It is clear that the private-practice exemption from the Act is, to a considerable extent, based on the legislative perception that institutional cost factors are not relevant to the private practice of medicine. We are of the view that they cannot be made to apply simply on the basis of the manner in which an otherwise "private office" organizes its internal business management, particularly where, as in the case of these three appellants, the net effect of the mode of internal management is to reduce costs and increase professional efficiency in an arrangement in which the physicians retain control of all medical implications of the practice as well as the fee-setting discretion.
Thus, the fact that the physicians engaged in the practice have made no capital investment in the office equipment is irrelevant in determining the character of their practice "modality" so long as the nature and cost of that equipment, supplied by others and "paid for" by the physicians in the form of their reduced profits, is consistent with the nature and cost of the equipment ordinarily regarded as necessary and appropriate *58 to the practice of the same medical specialty. No more relevant are such non-professional matters as who pays the office expenses, who maintains business records, who pays the rent, who hires non-professional staff, and whether or not there is advertising. The point is that in any private practice all of these business, administrative and management chores must or may be performed. If the manner of their performance does not impinge upon the ordinary patient-private physician relationship and does not impinge upon professional control by the physicians of the medical practice and does not affect the essential character and commonly understood attributes of private practice, then it is evident that the "in-house" versus "out-of-house" business and administrative management of the practice has no fundamental impact on the "modality" of delivery of health care services.
As we have noted, the Commissioner concluded that the role played here by the management companies did not actually affect the essential nature of the delivery of the health care services rendered. Rather, her concern was for the potential ethical problems which might result from the business relationship between the physicians and the management companies and the possibility that that relationship might ultimately affect medical judgment by encouraging the physicians to provide medical care which is unnecessary or too speedily delivered. We agree with the administrative law judge's observation that medical ethics problems are properly matters for the Board of Medical Examiners and are not primarily within the regulatory or adjudicatory jurisdiction of the Commissioner. Beyond that, the experience reflected by the record before us contradicts her speculation of a possible influence by the management companies over medical judgment.[1] We appreciate the Commissioner's *59 concern for the protection of the public from unscrupulous and unethical private practitioners. In view of this record, however, we do not perceive how this desideratum is promoted by classifying a private practice as a health care facility simply because it uses outside business and administrative management services. The attempted imposition on these practices of certificate of need and licensing requirements therefore suggests to us that the real subject of administrative concern here may well have been the nature of the medical services rendered by these practices rather than other relevant considerations.[2]
Appellants here advance alternative legal theories in challenging the Commissioner's determination. They argue that a certificate of need and licensing requirement for these practices would unconstitutionally impinge upon their patients' right of access to abortion services. They also contend that because the Department of Health had previously regarded outside management contracts as not affecting the private-practice classification, so broad a change in policy as is represented by the Commissioner's determination here may only be accomplished by regulation and not by adjudication. We do not, however, address *60 these contentions since we are satisfied that these practices are not by definition within the regulatory scope of the Act.
The determinations of the Commissioner of Health appealed from are reversed.
NOTES
[1] Although mere speculation is patently an improper decisional basis, we nevertheless might also speculate that those physicians who need to recoup their office capitalization costs and who may be operating their offices on a less economically efficient basis because of their direct and time-consuming involvement in non-professional office management details might have an even greater incentive to insure the gross profitability of their practices.
[2] We note that the Department of Health has in the past expressed special administrative concern for first trimester abortions. Thus, until June 5, 1983, the Department of Health had in effect rather extensive interim regulations governing first trimester abortions. See N.J.A.C. 8:40. These interim regulations required, among other things, a 24 hour waiting period, see N.J.A.C. 8:40-4.7(g), a requirement now deemed to be unconstitutional. See Akron v. Akron Center for Reproductive Health, Inc., ___ U.S. ___, ___, 103 S.Ct. 2481, 2503, 76 L.Ed.2d 687, 716 (1983). In any event, these regulations were repealed, and superseded by N.J.A.C. 8:43A-8.1, a more general provision governing standards for licensure of ambulatory care facilities. See 15 N.J.R. 922 (adoption of repeal); 15 N.J.R. 308 (proposed repeal); 15 N.J.R. 9(a) (proposed ambulatory care regulation); 15 N.J.R. 440 d (adoption of new regulation effective March 21, 1983) (readoption proposed June 20, 1983. See 15 N.J.R. 994(a)). Unlike the former interim rules, which were of dubious validity, the new regulation does not impose any requirements on first trimester abortions.