856 A.2d 756 (2004)
372 N.J.Super. 170
SAINT PETER'S UNIVERSITY HOSPITAL, Plaintiff-Appellant,
v.
Clifton R. LACY, Commissioner of the New Jersey Department of Health and Senior Services, Mary Wachter, Chief of Staff of the New Jersey Department of Health and Senior Services, and the New Jersey Department of Health and Senior Services, an Agency of the State of New Jersey, Defendants-Respondents, and
Robert Wood Johnson University Hospital, Intervenor-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2004.
Decided September 14, 2004.
*757 Anthony A. Bongiorno (McDermott, Will & Emery, attorneys; Mr. Bongiorno, of counsel and, with Mark W. Pearlstein and Jennifer S. Geetter, on the brief) of the Massachusetts bar, admitted pro hac vice, Boston, MA, argued the cause for appellant (Sills Cummis Epstein & Gross, attorneys; Steven S. Radin, attorney, Newark).
Melissa H. Raksa, Deputy Attorney General, argued the cause for respondent Department of Health and Senior Services (Peter C. Harvey, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Erin O'Leary, Deputy Attorney General, on the brief).
Joseph M. Gorrell, Roseland, argued the cause for intervenor-respondent (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; Mr. Gorrell, of counsel and, with Richard B. Robins, on the brief).
Before Judges KESTIN, CUFF and WINKELSTEIN.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
Saint Peter's University Hospital (St. Peter's) appeals from the adoption by the Department of Health and Senior Services (the Department) of regulations codified at N.J.A.C. 8:43G-22A.6(c) and (e) on the ground that those provisions violate the certificate of need (CN) requirements of the Health Care Facilities Planning Act (the Act), N.J.S.A. 26:2H-1 to -26. Shortly after St. Peter's filed its notice of appeal, Robert Wood Johnson University Hospital (RWJ) moved to intervene as a respondent. We granted the motion.

I
St. Peter's operates a children's hospital licensed to conduct a specialized pediatric service known as a regional perinatal center (RPC). The Act requires that a children's hospital apply for and obtain a CN before qualifying to operate an RPC. See *758 generally N.J.S.A. 26:2H-7 to -12. In 2002, however, the Department promulgated regulations requiring "[a] licensed children's hospital not licensed to operate [an RPC] ... [to] file a licensing application to initiate such a service[.]" N.J.A.C. 8:43G-22A.6(d). An applicant was "not ... required to obtain certificate of need approval to establish such a ... center[.]" N.J.A.C. 8:43G-22A.6(e). RWJ has represented that, historically, it had operated the only licensed children's hospital without an RPC.
St. Peter's urges that the regulations be invalidated on the ground that they conflict with the Act to the extent they authorize the approval of RPCs without CNs. We conclude that the Legislature has clearly expressed its intent that the CN mechanism be retained as an integral part of the process for approving undertakings such as RPCs, and that the challenged regulations are invalid because they contravene that legislative requirement.

II
On April 1, 2002, the Department proposed new regulations governing licensure standards for children's hospitals. See 34 N.J.R. 1305(a). During the comment period, St. Peter's submitted written objections to one of the proposed regulations, later codified as N.J.A.C. 8:43G-22A.6(c), which required all children's hospitals to operate RPCs within a year of the rule's adoption. An RPC is "a general acute care hospital which is designated and licensed to provide care to high risk mothers and neonates. Such a facility provides consultation, referral, transport and follow-up to other members of its Maternal and Child Health Consortium." N.J.A.C. 8:33C-1.2. The Consortium is "a voluntary [sic] formed nonprofit organization which is licensed as a central service facility by the Department as specified in these rules, and incorporated under Section 501(c)(3) of the United States Internal Revenue Code." Ibid.
St. Peter's, which operated a children's hospital that already had an RPC, asserted in its objections that such a facility demanded certain human and financial commitments that would unduly burden a hospital that had not chosen to operate an RPC in the past. St. Peter's protested, as well, that the "proposal will also place undue competitive and economic pressures on current centers," such as its own, impairing its financial integrity as well as RWJ's, thus derogating some of the policies informing the CN requirement. St. Peter's urged that RPCs be mandated only when meeting a geographic need, "as determined through a rational review in the certificate of need process."
At a meeting of the Health Care Administration Board on September 19, 2002, the Department recommended approval of the proposed regulations without change, and the Board voted accordingly. The regulations were published and effective on October 21, 2002. See 34 N.J.R. 3637(b). In its adoption notice, the Department summarized St. Peter's written objections and responded to them:

COMMENT: [St. Peter's] reported a single area of concern with the proposed rules. While the commenter agrees that all children's hospitals should maintain a NICU, it does not agree that each should be a regional perinatal center (RPC). [St. Peter's] argues that "the responsibilities associated with operation of a RPC are broad in scope. These centers must comply with strict facility and service requirements. RPCs are further required to provide community education programs and follow-up care geared toward the specific needs of neonatal patients. Existing RPCs have made the necessary financial *759 commitments and investments in human capital to comply with these necessarily rigorous rules. Requiring this same commitment from all licensed children's hospitals will place an undue financial burden on existing children's hospitals that would, under this proposal, be forced to seek designation as a RPC. This proposal will also place undue competitive and economic pressures on current centers." The commenter asked for the removal of the requirement for children's hospital to become a RPC at proposed [N.J.A.C.] 8:43G-22A.6(c).

RESPONSE: The Department disagrees. The Department contends that it is essential that all children's hospitals provide the services of a RPC, services geared toward the needs of pregnant women, neonates, and pediatric patients. To permit a children's hospital to do less would damage access to a smooth continuum of necessary services for these classes of patients.
[34 N.J.R. 3638.]
The regulatory provisions challenged are subsections of N.J.A.C. 8:43G-22A.6. They provide:
(c) By October 21, 2003, all licensed children's hospitals shall operate a regional perinatal center in accordance with N.J.A.C. 8:43G-19, and applicable provisions of N.J.A.C. 8:33C, including N.J.A.C. 8:33C-3.4(a)3 through 10.
* * *
(e) A licensed children's hospital not also licensed to operate a pediatric intensive care unit or a regional perinatal center on October 21, 2002 shall not be required to obtain certificate of need approval to establish such a unit or center, including neonatal intensive or intermediate care unit(s) within the center.
1. A licensed children's hospital without a licensed pediatric intensive care unit may establish such a unit with a maximum size of six beds without certificate of need approval.
2. A licensed children's hospital without a licensed neonatal intermediate or intensive care unit may establish such a unit(s) with a maximum size of four bassinets for an intermediate care nursery and six bassinets for an intensive care nursery without certificate of need approval.
St. Peter's unsuccessfully moved before the Department for a stay of the challenged regulations pending appeal. Following the filing of its notice of appeal, St. Peter's moved before us for a stay pending appeal. The Department cross-moved for a partial remand so that it could amend the regulations to cure appellant's objections.
In separate orders entered on November 18, 2002, we denied the motion for a partial remand, and granted a stay pending appeal "without prejudice to the authority of the [Department] to propose and adopt amendments to the challenged regulations and to seek, thereafter, such relief regarding the appeal as may be appropriate."
On February 3, 2003, the Department published a proposed amendment to the disputed regulation. See 35 N.J.R. 582(a). The proposal eliminated the mandate for RPC's, instead requiring only that all children's hospitals have a "community perinatal center-intensive." See 35 N.J.R. 583. After receiving comments, however, the Department, on May 5, 2003, withdrew the proposed amendment, explaining that 523 out of the 530 commenters supported the RPC mandate in the existing regulation, and that 529 opposed the amendment. See 35 N.J.R. 1831(a).
On June 30, 2004, after oral argument in this appeal, while consideration was pending, we received a communication from the *760 Attorney General advising that the Department, on June 4, 2004, had notified RWJ of the approval of RWJ's CN application for a change in scope "from Community Perinatal Center-Intermediate to Regional Perinatal Center."
We received a letter from counsel for St. Peter's, dated July 7, 2004, objecting to this action and asserting that the decision of June 4, 2004,
was issued under the Department's expedited review process, N.J.A.C. 8:33-5.1 et seq., rather than the full review process, N.J.A.C. 8:33-4.1 et seq., thereby avoiding the requirement of the full review process that [RWJ]'s application be considered by the State Health Planning Board.
The Attorney General's letter is the first time Saint Peter's has been notified that [RWJ] had filed an application for a Certificate of Need as a Regional Perinatal Center."
The letter continued with argument and concluded:
Simultaneously with this letter Saint Peter's has filed a Notice of Appeal from the Department's June 4, 2004 decision. Saint Peter's requests that this Court vacate the June 4, 2004 decision, pursuant to R. 2:9-1, as being outside the Department's jurisdiction during the pendency of this appeal. In the alternative, Saint Peter's requests that the Court i) stay the June 4, 2004 decision, ii) consolidate the appeal of that decision with the pending appeal, iii) order the Department to file its statement of items comprising the record with respect to the June 4, 2004 decision within 14 days of this date instead of the 30 days provided by R. 2:5-4(b), and iv) fix an expedited schedule for briefing and oral argument on the validity of the June 4, 2004 decision.
We declined to consider the informal communication of counsel for St. Peter's as a motion. Shortly thereafter, however, we received a formal motion from counsel for RWJ, in which the Attorney General joined, seeking dismissal of this appeal as moot. We regarded the letter from counsel for St. Peter's as a response to that motion. We denied the motion.

III
St. Peter's contends that N.J.A.C. 8:43G-22A.6(e) is ultra vires because it contradicts the provision of the Act that requires a hospital to obtain a CN before offering any new health care service, N.J.S.A. 26:2H-7. In response, both RWJ and the Department insist that the Legislature, in pronouncing a strong public policy favoring high-quality services in children's hospitals, has conferred on the Department the broad discretion to decree what services must be provided; and that this delegation necessarily includes the power to dispense with the CN requirement for certain services, such as RPCs.
Administrative regulations are entitled to a presumption of validity and reasonableness. See Bergen Pines County Hosp. v. Department of Human Servs., 96 N.J. 456, 477, 476 A.2d 784, 795-96 (1984); In re Protest of Coastal Permit, 354 N.J.Super. 293, 329, 807 A.2d 198, 220-21 (App.Div.2002). The principle of judicial deference to an agency's regulatory judgment is based upon the idea that "an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area." Id. at 330, 807 A.2d at 221. See also In re Freshwater Wetlands Protection Act Rules, 180 N.J. 478, 489, 852 A.2d 1083, 1090 (2004); New Jersey State League of Municipalities v. Department of Cmty. Affairs, 158 N.J. 211, 222, *761 729 A.2d 21, 27 (1999); Bergen Pines, supra, 96 N.J. at 474, 476 A.2d at 793. Thus, a party challenging a regulation bears the burden of overcoming its presumptive validity by showing that it is arbitrary, capricious, unreasonable, or plainly incompatible with the statute it purports to effectuate. See Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d at 1090; Protest of Coastal Permit, supra, 354 N.J.Super. at 330, 807 A.2d at 221.
An agency may not arrogate to itself the power to achieve goals not within its legislative charge. See Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d at 1090; Perreira v. Rediger, 169 N.J. 399, 416, 778 A.2d 429, 439 (2001). "In short, an administrative code provision must give way if it is inconsistent with a state statute." Ibid.
St. Peter's argues that N.J.A.C. 8:43G-22.6(c) and (e) contravene the mandate of N.J.S.A. 26:2H-7:
No health care facility shall be constructed or expanded, and no new health care service shall be instituted after the effective date of P.L. 1971, c. 136 (C.26:2H-1 et seq.) except upon application for and receipt of a certificate of need as provided by P.L. 1971, c. 136 (C.26H-1 et seq.).
The Commissioner of Health and Senior Services is empowered to issue CNs for health care facilities, see N.J.A.C. 8:33-1.2(f), if the applicant establishes a need for the facility, satisfying the following enumerated criteria:
(a) No certificate of need shall be issued unless the action proposed in the application for such certificate is necessary to provide required health care in the area to be served, can be financially accomplished and licensed in accordance with applicable licensure regulations, will not have an adverse impact on access to health care services in the region or Statewide, and shall contribute to the orderly development of adequate and effective health care services. In making such determinations there shall be taken into consideration:
1. The availability of facilities or services which may serve as alternatives or substitutes;
2. The need for special equipment and services in the area;
3. The adequacy of financial resources and sources of present and future revenues;
4. The availability of sufficient man-power in the several professional disciplines; and
5. Other applicable requirements which are specified in any health planning rule adopted by the Department.
[N.J.A.C. 8:33-4.9(a).]
In 1998, the Legislature amended the Act to exempt certain services from the CN requirement. L. 1998, c. 43. In its findings and declarations, the Legislature reviewed the history of the CN system. N.J.S.A. 26:2H-6.1. The CN requirement was one tool in the highly centralized health-care planning system inaugurated in 1971. Its original purpose "was to control costs by limiting the proliferation of health care services through State control of those services." N.J.S.A. 26:2H-6.1e. But the regulatory context had changed since 1971: the evolution of market-based means of controlling costs, plus advances in technology, had "exposed the inefficiencies" in the centralized-planning system. N.J.S.A. 26:2H-6.1c. In 1992, the Legislature began dismantling the existing regulatory structure in favor of allowing free-market competition. N.J.S.A. 26:2H-6.1d. The CN program was "the last remaining vestige" of the old system, and the legislature determined to cut it back in favor of allowing health care providers to decide *762 what services were needed in the communities they served. N.J.S.A. 26:2H-61e, f, g. Thus, the Legislature exempted many services from the CN prerequisite. See N.J.S.A. 26:2H-7a, c. Specialized acute-care children's hospital services, such as RPCs, were not among the exemptions.
As to those services not statutorily exempted, the Legislature recognized that the CN process might still be necessary, and it created a commission to decide which services should remain subject to the CN mandate:
h. For reasons of maintaining the quality of certain health care services, a limitation of the proliferation of such services may continue to be essential to protect the viability of the services as well as the providers now rendering them, to protect the role of such institutions as urban hospitals, whose importance to the Statewide health care system is indisputable, and to guard against the closing of important facilities and the transfer or services from facilities in a manner which is harmful to the public interest; and
i. Therefore, it is essential, in order to promote greater efficiency in the State's health care delivery system, to eliminate the certificate of need requirement for many services immediately, to eliminate the requirement for other services over a more extended period, and to create a commission to consider whether certain remaining health care services should continue to be subject to a certificate of need requirement in the interest of the well-being of the public and to ensure the maintenance of quality health care throughout the State.
[N.J.S.A. 26:2H-6.1.]
The Certificate of Need Study Commission (Commission or Study Commission) was charged with examining "the impact that elimination of certificate of need requirements would have on [enumerated services, including] specialized perinatal and pediatric services[.]" N.J.S.A. 26:2H-7.9b. The Commission was to submit to the Governor and the Legislature a report of its recommendations. N.J.S.A. 26:2H-7.9c.
In its report issued on March 31, 2000, the Commission listed seventeen classes of services that it recommended "remain subject to certificate of need review." Among those services were RPCs, which the Commission addressed as follows:
Specialized Perinatal and Pediatric Services, including Maternal and Child Health Consortia: neonatal bassinets and pediatric intensive care have been noted above. Retain Consortia under certificate of need until a study, conducted by the Division of Family Health Services, of their effectiveness and need for continued funding is completed. Until then, the consortia serve a public and provider education function and coordinate the delivery of a number of preventive and primary care programs, as well as assist hospital inpatient units in developing regional perinatal care plans, including a transport and referral system. This entire system is recommended to remain with certificate of need pending the study outcome.
The Commission explained further why a CN was needed for the listed services:
A. Quality and volume are closely interrelated for many of the services we studied. Certificate of need, as opposed to licensing standards, is a tool to prevent quality problems in these areas by promoting expansion of services only when a population-based need can be shown, thus assuring sufficient volume to maintain staff skills and program financial viability.

*763 B. While enhanced licensing standards addressing volume, performance and outcome standards are important in and of themselves, they cannot substitute for certificate of need because:
 it is extremely difficult and time-consuming to close an existing, underutilized service provider that pursues a legal appeal process to avoid closure.
 existing, well-developed and utilized programs would be irreparably harmed by numerous, new low-volume providers.
 they cannot address the negative quality impact on consumers and other providers while a new provider is granted a period of time to meet standards.
 they cannot address issues of access or the concerns of urban/inner-city facilities.
 they cannot address the potentially large negative impact on the state budget.
The Commission added that "the direct review certificate of need process permits the public to participate in the development of the health care system in the area in which they reside."
Using this history, St. Peter's argues that the Legislature has clearly expressed its will to retain the CN requirement as to RPCs. It stresses that the 1998 amendment exempted some services but not RPCs, and that the Commission, which studied the issue on behalf of the Legislature, concluded that RPCs and similar services were best regulated via the CN process as opposed to the licensing process. St. Peter's contends further that RPCs foster the Legislature's policy goals of assuring the quality of services rendered. See, e.g., N.J.S.A. 26:2H-6.1g, h, i.
The challenged regulations frustrate that policy, St. Peter's argues, because they require RWJ to open an RPC, even though RWJ is in the same region, Central New Jersey, as St. Peter's, and "even though the area has no need for an additional RPC." St. Peter's contends:
This requirement directly undermines the CN's primary purpose of maintaining the quality of health care services, see N.J.S.A. 26:H-6.1, by ensuring that RPC staff treat a sufficient volume of patients to maintain their expertise. If the Challenged Regulation stands, patient volume will be significantly diluted so that no RPC in the New Brunswick area will have the opportunity to treat the necessary critical mass of patients.
St. Peter's contends further that its RPC, and the one other RPC in its region other than RWJ's operation, have satisfied the public demand for such services with capacity to spare. It alleges, inter alia, that there is no unmet demand justifying the establishment of yet another RPC, and that an excess of such services "would dilute the quality of care provided to women and newborns, undermine St. Peter's financial viability[,] and weaken its ability to compete with [RWJ]." RWJ has stressed the need for all children's hospitals to offer RPC care, and has placed in question St. Peter's assertion that quality of care would be jeopardized if RWJ were allowed to operate an RPC. These competing positions cannot be assessed in the context of this appeal. They are, however, distinctly amenable to evaluation in the CN process.
We are also mindful that the Department has specifically determined
that it is essential that all children's hospitals provide the services of an RPC, services geared toward the needs of pregnant women, neonates, and pediatric patients. To permit a children's *764 hospital to do less would damage access to a smooth continuum of necessary services for these classes of patients.
[34 N.J.R. 3638.]
The contradictory arguments of St. Peter's and RWJ aside, and with due deference to the Department's determination, the primary question before us is whether, in promulgating the regulations at issue, the Department acted within its authority to permit such facilities outside the CN process, or whether the governing statutory scheme requires the CN mechanism as a prerequisite. By these measures, the regulations must fall.
The Legislature has stated its intendment with clarity. In general, CNs are required for all health care facilities unless specifically exempted by statute. See N.J.S.A. 26:2H-7. RPCs are not among the statutory exemptions, and the Study Commission recommended rather specifically that they should not be exempted from CN requirements. Considered in the light of N.J.S.A. 26:2H-7 and the pertinent legislative history, the regulations are invalid by reason of their conflict with statutory requirements. Cf. Freshwater Wetlands, supra, 180 N.J. at 490-91, 852 A.2d at 1090-91.
In evaluating the issues in this case, we have the benefit of unmistakably plain legislative expressions regarding the continuing viability of the CN system for various health care services. In 1998, the Legislature chose to exempt some services from the CN requirement, and created the Study Commission to help it decide whether others, such as RPCs, should also be exempt. The Commission recommended that the CN requirement for RPCs should be maintained, and it articulated policy-based reasons for that determination. The Legislature took no further amendatory action in this connection after receiving the Commission's March 2000 report.
Had the Legislature wished to exempt RPCs from the CN requirement it could have done so in either the 1998 amendment, or in an amendment after the Commission's March 2000 report. By remaining silent, the Legislature must be taken to have signified its satisfaction with the pre-1998 methods for approving RPCs. Cf. id. at 491-94, 852 A.2d at 1091-93.
We are not at liberty to decide whether the Legislature's manifest intent represents the best health care policy for the State. See New Jersey Educ. Ass'n. v. Bd. of Trustees, PERS, 327 N.J.Super. 326, 334, 743 A.2d 353, 357 (App.Div.2000)(observing that "[j]ust because a regulation may be useful, does not necessarily make it valid"). The only question we can address is whether the regulations at issue contravene the Act. We hold that they do. Cf. Freshwater Wetlands, supra, 180 N.J. at 493, 852 A.2d at 1092-93.
None of the policy arguments presented by RWJ or the Department justify a contrary result. The Department is not empowered to exercise its responsibilities for supervising health care in New Jersey in a way that contravenes the statutes it is charged with administering. Nor may it arrogate to itself the authority delegated to the Study Commission to determine, in the first instance, which services should remain subject to the CN requirement. Any efforts to modify the CN structure must be directed to the Legislature. Cf. id. at 493-94, 852 A.2d at 1091-93; New Jersey Educ. Ass'n., supra, 327 N.J.Super. at 334, 743 A.2d at 357.
RWJ and the Department stress the significance of the Legislature's designation of both St. Peter's and RWJ as "children's hospitals" in N.J.S.A. 26:2H-18d, effective in 1993. They argue that those designations were equivalent to granting *765 CNs; hence, the Department had the power to promulgate standards for licensure of facilities in those hospitals without applying the standards or procedures normally associated with the CN process. This attempt to elevate a specific legislative determination to the status of a general provision affecting CN requirements is unpersuasive. That the Legislature chose to designate certain institutions as "children's hospitals" does not invest the Department with the authority to adopt standards for those hospitals that directly conflict with general provisions of the Act. The N.J.S.A. 26:2H-18d designation cannot substitute for the finding of need that the issuance of a CN would supply. The Legislature's choice of inaction in this regard following its Study Commission's report is the clearest possible expression, in the circumstances, of its commitment to preserve the CN processas opposed to the application of more ordinary licensure standardsin assessing whether RPCs should be approved.
The standards for designating as "children's hospitals" those institutions not already so classified, adopted in L. 1999, c. 394, § 5, are equally unavailing. A hospital that newly qualified as a "children's hospital" was exempt from the CN requirement of N.J.S.A. 26:2H-7, but it was nevertheless required to obtain a CN "regarding the establishment of specific health care services within the hospital." L. 1999, c. 394, § 4. Moreover, by its own terms, that law expired 180 days after January 18, 2000. L. 1999, c. 394, § 6. It appears the statute was designed to expire after all eight New Jersey Children's Hospitals had received their designations.
We are also unpersuaded by RWJ's argument that L. 1999, c. 394 reflected the Legislature's intent that the Department promulgate minimum standards for children's hospitals. Section 1f of that statute declared a policy in favor of statewide standards requiring children's hospitals to provide a minimum level of services. On the basis of that declaration, RWJ suggests the Department had the authority to adopt the challenged regulations even after the statute's expiration.
We agree with St. Peter's that the now-expired 1999 statute has no capacity to validate the regulations at issue. By its terms, that statute did not apply to entities such as St. Peter's and RWJ that had already obtained the designation as a "children's hospital." Moreover, that enactment did not authorize the Department to promulgate regulations. Indeed, the final version of the bill deleted a previously-included clause authorizing such regulations, apparently at the recommendation of the Governor out of deference to the assignment that had been given to the Study Commission. Finally, the 1999 statute itself reaffirmed that the CN requirement continued to apply to "the establishment of specific health care services within the hospital." L. 1999, c. 394, § 4.

IV
For the foregoing reasons, we declare N.J.A.C. 8:43G-22A.6(c) and (e) to be invalid as inconsistent with the requirements of statute, N.J.S.A. 26:2H-7. Having reached this conclusion, we need not address the additional arguments St. Peter's advances that the procedures employed in promulgating the regulations violated the requirements of the Administrative Procedure Act, specifically N.J.S.A. 52:14B-4.

V
This disposition is limited to the issues advanced in this appeal, i.e., having to do with the validity of N.J.A.C. 8:43G-22A.6(c) and (e). We do not address any *766 issues that have arisen from the Department's recent grant of a CN to RWJ. The questions that emanate therefrom must be separately addressed in the appeal that has been filed from that administrative action. The stay pending appeal which we granted on November 18, 2002 is vacated.