878 A.2d 829

SAINT PETER'S UNIVERSITY HOSPITAL, APPELLANT–RESPON-
DENT, v. CLIFTON R. LACY, M.D., COMMISSIONER OF THE
NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SER-
VICES, MARY WACHTER, CHIEF OF STAFF OF THE NEW
JERSEY DEPARTMENT OF HEALTH AND SENIOR SER-
VICES, AND THE NEW JERSEY DEPARTMENT OF HEALTH
AND SENIOR SERVICES, AN AGENCY OF THE STATE OF
NEW JERSEY, RESPONDENTS–RESPONDENTS, AND ROB-
ERT WOOD JOHNSON UNIVERSITY HOSPITAL, INTERVE-
NOR–APPELLANT.

Argued March 28, 2005—Decided August 11, 2005.

2

*Joseph M. Gorrell* argued the cause for intervenor-appellant (*Wolf, Block, Schorr & Solis–Cohen,* attorneys; *Mr. Gorrell* and *Richard B. Robins,* on the briefs).

*Melissa H. Raksa,* Deputy Attorney General argued the cause for respondents Clifton R. Lacy, M.D., Mary Wachter and New Jersey Department of Health and Senior Services (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Anthony A. Bongiorno,* a member of the Massachusetts bar, argued the cause for respondent Saint Peter's University Hospital (*Sills Cummis Epstein & Gross,* attorneys; *Mr. Bongiorno, Steven S. Radin* and *James M. Hirschhorn,* of counsel).

*Gage Andretta* argued the cause for amicus curiae, UMDNJ–Robert Wood Johnson Medical School (*Wolff & Samson,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

In October 2002, after due notice and comment and upon the approval of the Health Care Administration Board (Board), the Commissioner (Commissioner) of the New Jersey Department of Health and Senior Services (Department) adopted regulations

requiring that, "[b]y October 21, 2003, all licensed children's hospitals [in the State] shall operate a regional perinatal center [RPC]," *N.J.A.C.* 8:43G–22A.6(c), that is, "a general acute care hospital which is designated and licensed to provide care to high risk mothers and neonates." *N.J.A.C.* 8:33C–1.2. Those regulations, however, exempted already licensed children's hospitals from the requirement to obtain a certificate of need before establishing either a RPC, a pediatric intensive care unit (PICU) or a neonatal intensive or intermediate care unit (NICU). *N.J.A.C.* 8:43G–22A.6(e). It is the perceived conflict between that latter and specific exception and the general certificate of need requirements of the Health Care Facilities Planning Act (HCFPA), *N.J.S.A.* 26:2H–1 to –26, that gives rise to this appeal.

We hold that, given the presumption of validity and reasonableness we accord to administrative regulations, the regulations codified at *N.J.A.C.* 8:43G–22A.6(c) and (e) are valid. We, therefore, reverse the judgment of the Appellate Division invalidating those regulations.

## I.

In 1971, the Legislature adopted HCFPA to implement generally the declared "public policy of the State that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." *N.J.S.A.* 26:2H–1. Stated differently, HCFPA was "adopted in response to a growing concern over the rising cost of hospital care and, consequently, hospitalization insurance, in this state. It is essentially cost-containment legislation focusing on the institutional delivery of health care services." *Women's Med. Ctr. v. Finley*, 192 *N.J.Super.* 44, 56, 469 *A.*2d 65 (App.Div.1983), *certif. denied*, 96 *N.J.* 279, 475 *A.*2d 578 (1984). The public policy thus enunciated by the Legislature translated into the general certificate of need requirement of HCFPA: "[n]o health care facility shall be constructed or expanded, and no new health care service shall be instituted after

the [1971] effective date of [HCFPA] except upon application for and receipt of a certificate of need as provided by [HCFPA]." *N.J.S.A.* 26:2H–7. As part of the mechanisms for implementing HCFPA, the Legislature also mandated that the Commissioner,

> with the approval of the [B]oard, shall adopt and amend rules and regulations in accordance with the "Administrative Procedure Act," [*N.J.S.A.* 52:14B–1 to –25,] to effectuate the provisions and purposes of this act, including but not limited to: ... (3) standards and procedures relating to the licensing of health care facilities and the institution of certain additional health care services.
>
> [*N.J.S.A.* 26:2H–5b.]

The Legislature has revisited HCFPA several times since its original enactment. Of these, the provisions of *L.* 1992, *c.* 181, § 1, which added *N.J.S.A.* 26:2H–18d to HCFPA, are the most relevant. Effective January 9, 1993, *N.J.S.A.* 26:2H–18d required that, subject to and "contingent upon[ ] the execution of a written agreement between Robert Wood Johnson University Hospital/St. Peter's Medical Center and a majority of the acute care hospitals providing inpatient pediatric services which are located in the [listed catchment area] counties[,]" the Commissioner was obligated to "designate Robert Wood Johnson University Hospital/St. Peter's Medical Center in the City of New Brunswick as the State's specialty acute care children's hospital in central New Jersey for the counties of Hunterdon, Mercer, Middlesex, Monmouth and Somerset." [1] There was no separate legislative finding of need or a requirement for the issuance of a certificate of need for that designation. The Legislature, by its own sanction and vesting no discretion in the Commissioner, decreed that, once the condition precedent of a referring agreement was satisfied, Robert Wood Johnson University Hospital (RWJ Hospital) and St. Peter's University Hospital (St. Peter's) were to be designated by the Commissioner as "the State's specialty acute care children's hospi-

---

[1] *N.J.S.A.* 26:2H–18d recently was amended in two respects: to update the name "St. Peter's Medical Center" to "St. Peter's University Hospital," and, for the reasons set forth below, *infra*, *N.J.* at 16–17, 878 *A.*2d at 839 (2005), to delete Monmouth County from the catchment area in the statutory designation. *L.* 2005, *c.* 116, § 3 (effective June 29, 2005).

tal in central New Jersey." The required referring agreements were executed and the Commissioner, as mandated, designated both RWJ Hospital and St. Peter's as specialty acute care children's hospitals.

In April 2002, as required by *N.J.S.A.* 26:2H–5b, the Commissioner proposed new regulations governing the licensing standards for children's hospitals "designed to ensure that facilities licensed as children's hospitals provide more comprehensive and specialized pediatric care and meet more stringent requirements than hospitals licensed to operate a general pediatric service." 34 *N.J.R.* 1305(a) (April 1, 2002). In doing so, the Commissioner engaged in a deliberative and comprehensive process:

> To develop these proposed new rules, the Department convened a children's hospital advisory subcommittee, comprised of hospital administrators, clinical experts and other professionals to provide input on pediatric services. This subcommittee included representatives of all currently designated children's hospitals. The proposed new rules establish the necessary guidelines for the Department's Licensure and Inspections, Complaints and Compliance teams to determine facility compliance with the substantive standards applicable to children's hospitals.
> [*Ibid.*]

Both RWJ Hospital and St. Peter's, as "currently designated children's hospitals," were represented individually on this subcommittee.

Among other things, the proposed regulations required that, as part of the continuing designation as a licensed children's hospital, all licensed children's hospitals in this State had to operate a RPC "in accordance with the provisions contained in *N.J.A.C.* 8:43G–19, and *N.J.A.C.* 8:33C–3.4(c)3 through 10." *Ibid.* Although the proposed regulations required that a children's hospital not already licensed to operate either a PICU or a RPC file a licensing application for such a unit or center, the hospital was "not . . . required to obtain a certificate of need approval for the establishment of such units/services." *Ibid.* The proposed regulations specifie[d] that a children's hospital without a licensed [PICU] may establish such a unit for a maximum of six beds without certificate of need approval, and that a licensed children's hospital without a licensed [NICU] may create an intermediate care nursery with a maximum of four bassinets and an intensive care nursery with a maximum of six bassinets without certificate of need approval.

[*Ibid.*]

Although the Administrative Procedure Act only requires a presumptive thirty-day notice and comment period prior to the adoption of an agency regulation, *N.J.S.A.* 52:14B–4(a)(1), the Commissioner specifically provided for a sixty-day comment period on these proposed regulations. 34 *N.J.R.* 1306 (April 1, 2002).

Ten entities commented; of these, four—RWJ Hospital, St. Peter's, St. Joseph's Hospital and Medical Center, and Hackensack University Medical Center—are licensed children's hospitals. Only one of these—St. Peter's—objected to the proposed requirement that, in order to retain a meaningful designation as a licensed children's hospital, the licensed children's hospital also must be licensed to operate a RPC. St. Peter's comments, and the Commissioner's response, merit examination in full:

COMMENT: [St. Peter's] reported a single area of concern with the proposed rules. While the commenter agrees that all children's hospitals should maintain a NICU, it does not agree that each should be a regional perinatal center (RPC). [St. Peter's] argues that "the responsibilities associated with operation of a RPC are broad in scope. These centers must comply with strict facility and service requirements. RPCs are further required to provide community education programs and follow-up care geared toward the specific needs of neonatal patients. Existing RPCs have made the necessary financial commitments and investments in human capital to comply with these necessarily rigorous rules. Requiring this same commitment from all licensed children's hospitals will place an undue financial burden on existing children's hospitals that would, under this proposal, be forced to seek designation as a RPC. This proposal will also place undue competitive and economic pressures on current centers." The commenter asked for the removal of the requirement for [a] children's hospital to become a RPC [as] proposed [by] *N.J.A.C.* 8:43G–22A.6(c).

RESPONSE: The Department disagrees. The Department contends that it is essential that all children's hospitals provide the services of a RPC, services geared toward the needs of pregnant women, neonates, and pediatric patients. To permit a children's hospital to do less would damage access to a smooth continuum of necessary services for these classes of patients.

No changes are being made.

[34 *N.J.R.* 3638 (October 21, 2002).]

Although addressing some of the considerations relevant in a certificate of need analysis, St. Peter's regulatory rule-making assault on these proposed regulations was not that they contravened the HCFPA requirement for a certificate of need before

any expansion of health care services could be approved. Instead, St. Peter's objection was limited in scope: according to St. Peter's, requiring existing licensed children's hospitals to establish and be designated as RPC's "will place an undue financial burden" on them and "will also place undue competitive and economic pressures on current centers." *Ibid.*

The Commissioner rejected St. Peter's objections and, on September 19, 2002, the Board approved the regulations, which became effective October 21, 2002. 34 *N.J.R.* 3638–39 (October 21, 2002). The specific regulations to which St. Peter's objected provide in full as follows:

(a) By October 21, 2003, all licensed children's hospitals shall operate a [PICU] in accordance with *N.J.A.C.* 8:43G–22.

(b) A licensed children's hospital not licensed to operate a [PICU] on October 21, 2002 shall file a licensing application to initiate such a unit in accordance with (a) above. Such a licensing application shall be filed in accordance with the procedures described in *N.J.A.C.* 8:43G–2.2 through 2.5, as applicable.

(c) By October 21, 2003, all licensed children's hospitals shall operate a [RPC] in accordance with *N.J.A.C.* 8:43G–19 and applicable provisions of *N.J.A.C.* 8:33C, including *N.J.A.C.* 8:33C–3.4(a)3 through 10.

(d) A licensed children's hospital not licensed to operate a [RPC] on October 21, 2002 shall file a licensing application to initiate such a service, including [NICU](s), in conformance with (c) above. Such a licensing application shall be filed in accordance with the procedures described in *N.J.A.C.* 8:43G–2.2 through 2.5, as applicable.

(e) A licensed children's hospital not also licensed to operate a [PICU] or a [RPC] on October 21, 2002 shall not be required to obtain certificate of need approval to establish such a unit or center, including [NICU](s) within the center.

1. A licensed children's hospital without a licensed [PICU] may establish such a unit with a maximum size of six beds without certificate of need approval.

2. A licensed children's hospital without a licensed [NICU] may establish such a unit(s) with a maximum size of four bassinets for an intermediate care nursery and six bassinets for an intensive care nursery without certificate of need approval. [*N.J.A.C.* 8:43G–22A.6.]

St. Peter's sought review of two of these regulations—*N.J.A.C.* 8:43G–22A.6(c) and (e)—from the Appellate Division, *R.* 2:2–3(a)(2), and also separately sought from the Commissioner a stay of the regulations pending appeal. After the Commissioner denied that request, St. Peter's requested that the Appellate Division stay the regulations pending appeal; the Department cross-moved for a partial remand to amend the regulations to address St.

Peter's objections.[2] On November 18, 2002, the Appellate Division granted a stay pending appeal "without prejudice to the authority of the [Department] to propose and adopt amendments to the challenged regulations and to seek, thereafter, such relief regarding the appeal as may be appropriate." [3] Because of the nature of the stay granted, the Appellate Division denied the Department's cross-motion.

Addressing the merits of St. Peter's objections to these regulations, the Appellate Division framed the question as "whether, in promulgating the regulations at issue, the Department acted within its authority to permit such facilities outside the [certificate of need] process, or whether the governing statutory scheme requires the [certificate of need] mechanism as a prerequisite." *St. Peter's Univ. Hosp. v. Lacy*, 372 *N.J.Super.* 170, 182, 856 *A.*2d 756 (App.Div.2004). Concluding that, "[b]y these measures the regulations must fall," *ibid.*, the panel narrowed its focus to the specific regulatory provisions complained of by St. Peter's and "declare[d] *N.J.A.C.* 8:43G–22A.6(c) and (e) to be invalid as inconsistent with the requirements of [the certificate of need] statute, *N.J.S.A.* 26:2H–7." *Id.* at 185, 856 *A.*2d 756.

Upon the petition of RWJ Hospital, we granted certification. 182 *N.J.* 208, 863 *A.*2d 365 (2004). We denied leave to intervene

---

[2] The Department's efforts to separately address St. Peter's objections ultimately were for naught. Although the Department published a proposed amendment to *N.J.A.C.* 8:43G–22A.6(c) that would lessen the requirement from establishing a RPC to that of establishing a "community perinatal center—intensive[,]" 35 *N.J.R.* 582(a) (February 3, 2003), that proposal was withdrawn due to overwhelming criticism and almost unanimous opposition: of 530 written comments received, 529 were opposed and, of those in opposition, 523 "supported the [RPC] as the appropriate level of perinatal service delivery for all designated children's hospitals[.]" 35 *N.J.R.* 1831(a) (May 5, 2003). As the Department tersely noted: "A single consumer commenter supported the Department's proposal." *Ibid.*

[3] On June 16, 2003, the Appellate Division vacated its stay and, on August 8, 2003, RWJ Hospital was granted a license, as provided under the challenged regulations, to operate a RPC, which it has operated since.

to the University of Medicine and Dentistry of New Jersey—Robert Wood Johnson Medical School (UMDNJ/RWJ Medical School), but granted it *amicus curiae* status. For the reasons that follow, we reverse the judgment of the Appellate Division and reinstate the challenged regulations.

## II.

RWJ Hospital urges that we reverse the Appellate Division because it fails to interpret the certificate of need statute, *N.J.S.A.* 26:2H–7, *in pari materia* with the Legislature's designation of RWJ Hospital as a specialty acute care children's hospital. *N.J.S.A.* 26:2H–18d. RWJ Hospital argues that, without the requirements of the challenged regulations, the designation "children's hospital" is meaningless because it then becomes a watered-down version of a designated children's hospital that cannot perform any more health services than it can without that designation. RWJ Hospital also argues that the Appellate Division improperly applied the standard of review for administrative determinations and, instead, should have ruled the regulations valid. RWJ Hospital further argues that St. Peter's should be estopped because it applied for and received a license to operate a PICU without itself first securing a certificate of need.

In response, St. Peter's argues first that the challenged regulations cannot stand because they directly conflict with the certificate of need statute. Applying the criteria under the certificate of need statute, St. Peter's further argues that the challenged regulations exceed the scope of the Commissioner's authority because they would create a RPC under circumstances where there is no need, which is inconsistent with the certificate of need statute. St. Peter's also argues that estoppel is inapplicable here and, at oral argument, suggested that, if RWJ Hospital believed St. Peter's received its PICU license in contravention of the certificate of need statute, RWJ Hospital has a remedy: RWJ Hospital can challenge the issuance of that license before the Appellate Division.

The Commissioner and the Department assert that, by statutorily designating certain hospitals as specialty acute care children's hospitals, the Legislature, which created the certificate of need requirement in the first place, exempted those designated children's hospitals from the certificate of need process. Stated differently, they contend that the statutory designation of a hospital as a specialty acute care children's hospital is a legislative determination of need that requires no further resort to the certificate of need process. By way of analogy, the Commissioner and the Department argue that the Legislature similarly waived the certificate of need requirement in 1999, when it expressly made the certificate of need requirement applicable to newly designated children's hospitals, but only in respect of newly provided services. The Commissioner and the Department also argue that, unless substance is attributed to the designation "children's hospital," the designation is meaningless and, even worse, deceptive to the patient public.

The primary argument advanced by *amicus* UMDNJ/RWJ Medical School is that the Appellate Division's decision will negatively impact medical education in this State. According to UMDNJ/RWJ Medical School, it operates its fellowship program through RWJ Hospital and, therefore, it must have a teaching basis upon which to train future doctors.[4]

### III.

#### A.

▓▓▓ Early in our consideration of the Commissioner's rulemaking power under HCFPA, we held that "[a]dministrative

---

[4] At oral argument, we were advised that UMDNJ/RWJ Medical School previously operated its fellowship program through St. Peter's and that, for reasons that are not before us, that relationship was terminated. UMDNJ/RWJ Medical School now runs its fellowship program through RWJ Hospital; St. Peter's gets its resident and fellow staff from either Children's Hospital of Philadelphia or the Drexel University College of Medicine (formerly Hahnemann University), both located in Philadelphia, Pennsylvania.

regulations enjoy a presumption of legality and unless clearly *ultra vires* on their face, ... the person attacking them has the burden of proving their invalidity." *N.J. Ass'n of Health Care Facilities v. Finley,* 83 *N.J.* 67, 80, 415 *A.*2d 1147, *appeal dismissed and cert. denied,* 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980). More recently,

> we set forth the general principles in reviewing a challenged rule. We start with the premise that we must give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible. *In re Distrib. of Liquid Assets,* 168 *N.J.* 1, 10–11 [773 *A.*2d 6] (2001). Such deference is appropriate because it recognizes that "agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read ... and to evaluate the factual and technical issues that ... rulemaking would invite.' " *New Jersey State League of Municipalities v. Dep't of Cmty. Affairs,* 158 *N.J.* 211, 222 [729 *A.*2d 21] (1999) (quoting *Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.,* 96 *N.J.* 456, 474 [476 *A.*2d 784] (1984)). Consequently, agency rules are accorded a presumption of validity and reasonableness, *ibid.,* and the challenging party has the burden of proving the rule is at odds with the statute, *Bergen Pines County Hosp., supra,* 96 *N.J.* at 477 [476 *A.*2d 784].
>
> Despite that deference, a rule will be set aside if it is "inconsistent with the statute it purports to interpret." *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 26 [527 *A.*2d 843](1987). That is, the agency "may not under the guise of interpretation ... give the statute any greater effect than its language allows." *In re Valley Rd. Sewerage Co.,* 154 *N.J.* 224, 242 [712 *A.*2d 653] (1998) (Garibaldi, J., dissenting) (quoting *Kingsley v. Hawthorne Fabrics Inc.,* 41 *N.J.* 521, 528 [197 *A.*2d 673] (1964)). Thus, if the regulation is plainly at odds with the statute, we must set it aside. *See New Jersey Tpk. Auth. v. AFSCME, Council 73,* 150 *N.J.* 331, 351–52 [696 *A.*2d 585] (1997).
>
> [*In re Freshwater Wetlands Protection Act Rules,* 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004).]

Although the Appellate Division panel here properly set forth the foregoing standard of review, *St. Peter's Univ. Hosp. v. Lacy,* 372 *N.J.Super.* 170, 177–78, 856 *A.*2d 756 (App.Div.2004), we must part company with the result the panel reached in applying that standard.

## B.

▮ At its core, the controversy presented pits the certificate of need process that is part of HCFPA against that same statute's later designation of St. Peter's and RWJ Hospital as specialty

acute care children's hospitals. In those circumstances, our duty is clear: "When interpreting different statutory provisions, we are obligated to make every effort to harmonize them, even if they are in apparent conflict." *In re Gray–Sadler,* 164 *N.J.* 468, 485, 753 *A.*2d 1101 (2000) (citing *State v. Federanko,* 26 *N.J.* 119, 130, 139 *A.*2d 30 (1958)). Thus, our task is to harmonize, if possible, the HCFPA's certificate of need process with the Legislature's later designation of St. Peter's and RWJ Hospital as specialty acute care children's hospitals.

 Twenty-two years after first adopting the certificate of need requirement of HCFPA—and on the heels of having created its list of exemptions to the certificate of need requirement[5]—the Legislature specifically designated both RWJ Hospital and St. Peter's as "the State's specialty acute care children's hospital in central New Jersey for the counties of Hunterdon, Mercer, Middlesex, Monmouth and Somerset." *N.J.S.A.* 26:2H–18d. Because "[t]he Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose[,]" *State v. Federanko, supra,* 26 *N.J.* at 129, 139 *A.*2d 30, we conclude that the Legislature did not act in a vacuum and did not intend that such designation was to be in name only. It is clear that

> [t]he role of this Court in any statutory analysis is to determine the intent of the Legislature and give effect to its enactments if reasonably possible. When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will. In other words, it is our obligation to make every effort to harmonize separate statutes, even if they are in apparent conflict, insofar as we are able to do so.
>
> The presumption of validity is especially strong here in light of the similar subject matter and common purpose of both statutes.... Statutes that deal with

---

[5] *L.* 1992, *c.* 160, § 19, which created the list of statutory exemptions to the certificate of need requirement and was codified at *N.J.S.A.* 26:2H–7a, was approved November 30, 1992 and made effective January 1, 1993. *L.* 1992, *c.* 182, § 1, which statutorily designated RWJ Hospital and St. Peter's as "specialty acute care children's hospital[s]" and was codified at *N.J.S.A.* 26:2H–18d, was approved December 10, 1992, and was made effective January 9, 1993.

> the same matter or subject should be read in *pari materia* and construed together as a "unitary and harmonious whole." This maxim of statutory construction is especially pertinent when, as in this case, the statutes in question were passed in the same session.
>
> [*In re Adoption of a Child by W.P. and M.P.*, 163 *N.J.* 158, 182–83, 748 *A.*2d 515 (2000) (Poritz, C.J., dissenting) (citations and footnote omitted).]

The legislative designation of St. Peter's and RWJ Hospital as specialty acute care children's hospitals cannot be either a nullity or transparent window-dressing; it must have substance. Similarly, to engraft onto that designation the added requirement of a certificate of need is to take away with one hand what has been given with the other, and we cannot assume that the Legislature intended such a result. Instead, the view that most closely approximates the intent of the Legislature in creating statutorily designated children's hospitals must be that, when read in *pari materia* with the certificate of need statute, the designation is a legislative—in lieu of an administrative—finding of need, the implementation of which is delegated to the Commissioner.

Our conclusion that the Legislature, which created the certificate of need process in the first instance, intended the legislative designation of certain hospitals as children's hospitals to serve in lieu of the certificate of need process also is consistent with the interpretation the Commissioner and the Department have given this statutory enactment. We have stated the governing principle thusly:

> Generally, we do give substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.
>
> Nevertheless, administrative regulations are not binding on the courts and a regulation will fall if a court finds that the rule is inconsistent with the statute it purports to interpret.
>
> [*Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987) (citations omitted).]

That deference arises because "[t]he meaning ascribed to legislation by the administrative agency responsible for its implementation, ... is persuasive evidence of the Legislatures understanding of its enactment." *Cedar Cove, Inc. v. Stanzione*, 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991) (citations omitted). Our conclusion is

supported further by the unquestioned proposition that "[w]hen the Legislature expressly includes a requirement in one subsection and excludes that same requirement in other subsections of the same general statute, we need not strain to import that requirement where it is not." *In re Freshwater Wetlands Protection Act Rules, supra,* 180 *N.J.* at 492, 852 *A.*2d 1083.

Because "subsequent legislation may be used as an extrinsic aid when seeking to discern earlier legislative intent[,]" *Varsolona v. Breen Capital Servs. Corp.,* 180 *N.J.* 605, 623, 853 *A.*2d 865 (2004) (citations omitted), we also look to more recent legislative acts for guidance. In May 2004, the Assembly sought to designate "Jersey Shore University Medical Center as the State's specialty acute care children's hospital for Monmouth and Ocean counties." Assembly Bill No. 2884, 1b, 2b. As proposed by the Assembly, Jersey Shore University Medical Center was required to "compl[y] with all of the appropriate certificate of need and licensure requirements" as a condition precedent to such statutory designation. *Id.* at 1a. In March 2005, when Assembly Bill 2884 was considered by the Assembly Health and Human Services Committee, it was amended to

> designate Jersey Shore University Medical Center and Monmouth Medical Center, each, as the States special acute care childrens hospital for Monmouth and Ocean counties, *subject to the commissioners determination that each hospital* meets all of the licensure criteria that apply to a childrens hospital and *has met and complied with all of the appropriate certificate of need and licensure requirements* to obtain State authorization to offer the component services that constitute a children's hospital.
>
> [Assembly Bill No. 2884[1R], March 1, 2005 (emphasis supplied).]

As so modified, Assembly Bill No. 2884 was passed by the Assembly on March 14, 2005.

The Senate, however, rejected the requirement that either hospital satisfactorily complete the certificate of need process as a condition precedent to designation as a specialty acute care childrens hospital. As adopted by the Senate Health, Human Services and Senior Citizens Committee on May 5, 2005, approved by the Senate on May 16, 2005, and ultimately enacted into law on June 29, 2005, newly-enacted *N.J.S.A.* 26:2H–18g now

designate[s] Jersey Shore University Medical Center and Monmouth Medical Center, each, as the State's special acute care children's hospitals for Monmouth and Ocean counties, *subject to the commissioner's determination that each hospital* meets all of the licensure criteria that apply to a children's hospital and *has met and complied with all of the requirements* to obtain State authorization to offer the component services that constitute a children's hospital.
[*L.* 2005, *c.* 116, 1.]

The Legislature's intent is clear and applies with equal force to the earlier statutory designation concerning RWJ Hospital and St. Peter's: by creating statutorily designated children's hospitals, the Legislature obviated the certificate of need process once a statutory designation as a children's hospital is made. Viewed through that prism and because we are required to "give considerable weight to an agency's interpretation of a statute the agency is charged with enforcing[,]" *G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 170, 723 *A.*2d 612 (1999), the challenged regulations are entirely consistent with the statutory scheme and are neither arbitrary, nor capricious, nor unreasonable, nor plainly incompatible with HCFPA, the statute they in fact effectuate.[6]

## IV.

The judgment of the Appellate Division is reversed.

Justice ZAZZALI, dissenting.

This appeal requires the Court to decide the validity of regulations promulgated by the New Jersey Department of Health and Senior Services (Department) that require all children's hospitals to offer a Regional Perinatal Center (RPC) without first obtaining a certificate of need (CN). The Appellate Division held that "the Legislature has clearly expressed its intent that the CN mechanism be retained as an integral part of the process for approving undertakings such as RPCs, and that the challenged regulations are invalid because they contravene that legislative requirement."

---

[6] Because we hold that the challenged regulations are valid, we need not address the remaining arguments advanced by RWJ Hospital, the Commissioner and the Department, or UMDNJ/RWJ Medical School.

*Saint Peter's Univ. Hosp. v. Lacy,* 372 *N.J.Super.* 170, 173, 856 *A.*2d 756 (App.Div.2004). A majority of this Court disagrees with that conclusion and now reverses. Because I believe Judge Kestin's opinion properly analyzed this matter, I respectfully dissent.

The discussion below first compares the Department's regulations with the statutory language that establishes the CN requirement. I then consider indications of the Legislature's intent. Finally, I address the impact of recently enacted legislation regarding children's hospitals.

I.

A.

The CN statute is straight-forward: "No health care facility shall be constructed or expanded, and no new health care service shall be instituted ... *except upon application for and receipt of a certificate of need."* *N.J.S.A.* 26:2H-7 (emphasis added). The statute reflects this State's expressed public policy that while the "public health" requires medical and hospital services of the "highest quality" that are based on "demonstrated need," those services must also be "efficiently provided and properly utilized at a reasonable cost." *N.J.S.A.* 26:2H-1. The Department carries out that statutory mandate by regulating access to and the availability of certain health care services. It is undisputed that the Legislature did not exempt RPCs from regulation.

The challenged regulations, however, provide that even if a children's hospital is not currently licensed to operate an RPC, it need *"not ... obtain certificate of need approval* to establish such a ... center." *N.J.A.C.* 8:43G–22A.6(e) (emphasis added). Even a cursory comparison of the regulations and the statute reveals their incompatibility. The Department's regulations direct children's hospitals to ignore the statutory CN process when establishing RPCs, and, consequently, a children's hospital will not have to demonstrate any need for the new services. Because a regula-

tion cannot lawfully prohibit that which a statute requires, the Department has acted outside of its authority. *See In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004) (holding that "if the regulation is plainly at odds with the statute, we must set it aside."). I cannot fathom why we would allow the Department, "under the guise of interpretation[, to] . . . give the statute any greater effect than its language allows." *Ibid.* (internal quotation marks and citation omitted).

The majority "pits the certificate of need process . . . against that *same statute's* later designation of St. Peter's and [Robert Wood Johnson University Hospital] as specialty acute care children's hospitals." *Ante* at 13–14, 878 *A.*2d at 837 (emphasis added). Framing the issue as requiring the reconciliation of two statutory provisions does not address the core issue before this Court: whether the regulations purporting to waive the statutory CN requirement are valid. The battle is not between two statutes, but between a regulation and a statute.

Although "[a]dministrative regulations are entitled to a presumption of validity and reasonableness," *St. Peter's, supra,* 372 *N.J.Super.* at 177, 856 *A.*2d 756 (App.Div.2004) (citing *Bergen Pines County Hosp. v. Dep't of Human Servs.,* 96 *N.J.* 456, 477, 476 *A.*2d 784 (1984)), "an agency may not arrogate to itself the power to achieve goals not within its legislative charge," *id.* at 178, 856 *A.*2d 756 (citing *Freshwater Wetlands, supra,* 180 *N.J.* at 489, 852 *A.*2d 1083). In my view, the Appellate Division properly applied that standard when it overturned the regulations at issue here.

### B.

Apart from the language of the CN statute itself, the Legislature has indicated its intent that the CN requirement apply to RPCs. The Legislature established the Certificate of Need Study Commission (Study Commission) in 1998 to examine the value of the CN statute in a deregulated health care industry. The Study Commission found that, regarding RPCs,

*[q]uality and volume are closely interrelated.* ... Certificate of need, as opposed to licensing standards, is a tool to prevent quality problems in these areas by promoting expansion of services only when a population-based need can be shown, thus assuring sufficient volume to maintain staff skills and program financial viability.

[*St. Peter's, supra,* 372 *N.J.Super.* at 180, 856 *A.*2d 756 (citations omitted) (emphasis added).]

Thus, the Study Commission report underscores the value of the CN process and the danger in abandoning its application to RPCs.

The Legislature accepted the Study Commission's recommendation and twice declined to exempt RPCs from the CN process, although it exempted other health services. In so doing, "[t]he Legislature has stated its intendment with clarity. In general, CNs are required for all health care facilities unless specifically exempted by statute. RPCs are not among the statutory exemptions." *Id.* at 182, 856 *A.*2d 756 (citation omitted). As the Appellate Division emphasized, "we have the benefit of unmistakably plain legislative expressions regarding the continuing viability of the CN system for" RPCs. *Ibid.*

Despite the conclusions of the Study Commission and the Legislature, the Department determined that children's hospitals do not have to obtain a CN to establish an RPC. However, as noted above, the agency not only lacked the authority to waive the CN requirement, its decision contravened the very public policy *that it is charged with implementing.* St. Peter's argues that, under the new regulations, "patient volume will be significantly diluted [such] that *no* RPC in the New Brunswick area will have the opportunity to treat the necessary critical mass of patients." If that claim has merit, the regulation hinders both the proficiency of health care service providers and the efficiency of medical institutions. But the fears of St. Peter's will neither *be* vindicated nor repudiated because no CN review process will take place to determine whether the population base can support an additional RPC at Robert Wood Johnson University Hospital within one mile of the existing RPC at St. Peter's.

To be sure, the Department attempted to advance a seemingly logical goal: "to provide a smooth continuum of necessary services" for pregnant women, neonates, and pediatric patients. 34 *N.J.R.* 3638 (October 21, 2002). That objective may be laudable, but we are not in a position to decide whether the Department's determination is preferable to the Legislature's overarching view—and overriding mandate—concerning health care services. *See Saint Peter's, supra,* 372 *N.J.Super.* at 183, 856 *A.*2d 756. Respectfully, the majority opinion subordinates the "unmistakably plain legislative expressions regarding the continuing viability of the CN system," *id.* at 182, 856 *A.*2d 756, to the Department's "purpose" of the new regulation.

In sum, the statutory intent to uphold the CN statute's applicability to RPCs is clear based on the results of the Study Commission and the fact that the Legislature did not exempt RPCs from the CN requirement.

## C.

I recognize that the Legislature recently amended a statute that addresses the requirements that specific health care facilities must satisfy in order to be classified as children's hospitals. *L.* 2005, *c.* 116, § 1. Although the majority opinion correctly asserts that " 'subsequent legislation may be used by a court as an extrinsic aid when seeking to discern earlier legislative intent,' " *ante* at 16, 878 *A.*2d at 839 (quoting *Varsolona v. Breen Capital Servs. Corp.,* 180 *N.J.* 605, 623, 853 *A.*2d 865 (2004)), I have a different view of the amended statute.

The new legislation designates the Jersey Shore University Medical Center and the Monmouth Medical Center as "acute care children's hospitals ... subject to the commissioner's determination that each hospital meets all of the licensure criteria that apply to a children's hospital and *has met and complied with all of the requirements* to obtain State authorization to offer the component services that constitute a children's hospital." *L.* 2005, *c.* 116, § 1 (emphasis added). A prior version of the law, passed by the

Assembly but modified by the Senate, specifically required the hospitals' compliance with "all the appropriate *certificate of need* and licensure requirements." Assemb. B. No. 2884[1R] (March 1, 2005) (emphasis added). According to the majority, by removing the words "certificate of need" from the proposed version, the Legislature evinced an intent to "obviate[ ] the certificate of need process once a statutory designation as a children's hospital is made." *Ante* at 17, 878 *A.*2d at 839.

I disagree. Had the Legislature intended to waive the CN prerequisite for RPCs, it could have expressly done so. Instead, the statute subjects children's hospitals to "*all requirements* to obtain State authorization." *L.* 2005, *c.* 116, § 1 (emphasis added). By definition, "all" requirements includes those set forth in the CN statute, which the Legislature left unchanged. *See N.J.S.A.* 26:2H–7 ("[N]o new health care service shall be instituted . . . except upon application for and receipt of a certificate of need."). Thus, as St. Peter's observes, the newly enacted language is "broader, not narrower" than the wording that the Legislature rejected. Accordingly, I would conclude that the Legislature intended simply to designate two additional children's hospitals as such, not to eliminate the CN requirement.

## II.

The Department's regulations violated plain statutory language and frustrated—rather than furthered—the legislative intent and public policy. Accordingly, I would affirm the decision of the Appellate Division.

Justice WALLACE joins in this opinion.

*For reversal*—Chief Justice PORITZ, Justices LaVECCHIA, ALBIN, and RIVERA–SOTO—4.

*For affirmance*—Justices ZAZZALI and WALLACE—2.