**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2136-21

KAREN WISEMAN,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION AND
ANNUITY FUND,

      Respondent-Respondent.

_____

> Argued September 18, 2023 – Decided November 30, 2023
>
> Before Judges Natali and Puglisi.
>
> On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.
>
> Jason Earl Sokolowski argued the cause for appellant (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Jason Earl Sokolowski, of counsel and on the briefs).
>
> Brian D. Ragunan, Deputy Attorney General, argued the case for respondent (Matthew J. Platkin, Attorney

General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Brian D. Ragunan, on the brief).

PER CURIAM

Petitioner Karen Wiseman appeals from the February 4, 2022 final administrative decision of the Board of Trustees (Board) of the Teachers' Pension and Annuity Fund (TPAF) denying her application for ordinary disability retirement (ODR) benefits. The Board rejected the Administrative Law Judge's (ALJ) determination petitioner was permanently and totally incapacitated and disabled from performing her regular and assigned job duties as a result of her medical conditions, and instead found petitioner ineligible for ODR benefits. Because the Board's decision was not supported by the record, we reverse.

I.

On December 4, 2017, petitioner applied for ODR benefits. At its meeting on May 3, 2018, the Board denied her application, finding she was not totally and permanently disabled from performing her regular and assigned job duties. Petitioner appealed the decision, and the Board transferred the case to the Office of Administrative Law (OAL) for a hearing, which was held before Administrative Law Assignment Judge (ALJ) JoAnn LaSala Candido.

We glean these facts from the OAL record. Petitioner was a high school English teacher for approximately eighteen years, employed for the last fifteen years by the Bergenfield Board of Education. In addition to administrative and strategic tasks, pertinent requirements for a teacher position in Bergenfield include planning, preparing and delivering instruction; providing a nurturing, supportive and positive classroom climate that encourages student responsibility by using positive motivation, challenging instructional strategies and effective classroom management techniques; evaluating and grading classwork, homework, assignments and tests in a timely fashion; and conferencing with students and parents.[1]

In February 2015, petitioner began treating with Dr. Farzana Nanavati for neck pain and migraines. Dr. Nanavati testified at the OAL hearing as an expert in neurology. When Dr. Nanavati conducted her initial evaluation, petitioner had been diagnosed with chronic migraines approximately twenty years prior, with "chronic" being defined as occurring fifteen days per month or more. Petitioner had discontinued numerous medications because of ineffectiveness or side-effects, and was effectively treating her migraines with Botox injections

---

[1] Although the list of twenty-nine job requirements considered by the ALJ and the Board was from the Passaic Board of Education, petitioner testified the Bergenfield requirements were the same.

A-2136-21

every three months. She was also taking Neurontin, otherwise known as gabapentin, Imitrex and Fioricet to treat the migraines, and Ativan to treat anxiety and jaw clenching. Petitioner also reported she had been diagnosed with fibromyalgia in 2012. Dr. Nanavati described fibromyalgia:

> [I]t's a pain condition where there is diffuse pain in the body. It is some kind of—to make it easy, it is an imbalance in the pain pathway whereby the nerves that cause pain are hyperactive, whereas the nerves that inhibit pain are sort of dwindled, so the pain is perceived more and more by the patient without significant relief of the pain. It's a perceived pain condition. It is not something that you can diagnose by imaging and say, like, that is a cause of her pain. [It] affects a variety—a variety of sections in the body. It can affect the shoulders, the hips, the abdomen, the extremities, as well as the neck and the head. It is also accompanied by chronic fatigue, insomnia, which is sleep—difficulty sleeping—anxiety disorder. It's like a spectrum. It doesn't just cause pain. It also causes this fatigue and insomnia, anxiety disorder.

Petitioner's fibromyalgia was predominantly on the right side, and she also had numbness and tingling in her arms in the morning and in cold weather.

Based on her initial assessment, Dr. Nanavati believed petitioner had "mixed headaches," which included not just chronic migraines but headaches caused by muscle spasms in her neck and clenching her jaw. At that time, Dr. Nanavati continued petitioner on gabapentin and Botox treatments.

4

A magnetic resonance imaging (MRI) conducted in June 2016 showed petitioner exhibited "some kind of pathology at every level of her cervical spine." She had anterolisthesis, which is a shift of the vertebral body, at C3 to C4; severe arthrosis, which is inflammation, in her left facet joint at C4 to C5; a disc bulge that was contacting her spinal cord and arthrosis of the left facet joint at C5 to C6; and a bone spur at C6 and C7.

In August 2016, petitioner complained of agonizing neck pain, severe neck muscle spasms, worsening tingling in her arms, and daily headaches from neck pain. Dr. Nanavati reduced petitioner's use of gabapentin, which can cause "analgesic overuse headaches," and instead prescribed a different medication. When that medication caused petitioner to break out in hives, she switched to a third medication, but again developed itching and had to resume the use of gabapentin even though it potentially caused her further headaches. Dr. Nanavati testified petitioner's neck pain increased her headaches, sleep issues and anxiety.

By Fall 2017, petitioner was prescribed four medications for anxiety and depression, two medications for headaches, and a muscle relaxer. She had been diagnosed with cervical facet arthrosis, confirmed through MRI; and cervical spondylosis, which is degenerative disc disease of the spine.

5

An MRI conducted in February 2018 showed petitioner had "loss and severe reversal" of the normal curve of her cervical spine, caused by "very, very tight" muscles around the spine. Dr. Nanavati found this condition very significant and, in her opinion, it was the main cause of petitioner's discomfort.

In May 2018, petitioner underwent multi-level neck fusion surgery to stabilize her spine at C3-C4. The surgery relieved the tingling in petitioner's hands and legs but increased her headaches because she was unable to receive Botox injections for six months while recovering.

In May 2019, petitioner complained that her memory was worsening. An MRI did not reveal any structural issues with her brain. Dr. Nanavati's assessment was that petitioner's memory issues were caused by her chronic pain, sleep issues, anxiety and medication, all of which likely caused her to have difficulty paying attention consistently. At the time of the OAL hearing, petitioner continued to have "mixed headaches" approximately eight weeks after her quarterly Botox injection, neck pain and anxiety. Dr. Nanavati attributed these continuing issues to petitioner's degenerative disc disease and fibromyalgia. She opined that it was petitioner's

> fibromyalgia that is disabling, more of the neck pain that's disabling than her migraine headaches. Of course, the headaches do count. It's not just one single diagnosis. At that time when she was in her [thirties],

6

you know, her migraines were being treated and she probably did have good response with Botox at that time. But over the years, her neck pain is what became severe and disabling and over the years, it's her fibromyalgia that totally weighed her down more so than the migraines, which are still under control with the Botox.

Dr. Nanavati reviewed the job requirements for a teacher with petitioner:

I realized that the performance of a teacher included not just teaching the students, but also planning and preparing what she has to deliver to the students, the instruction of the curriculum. She has to also provide a nurturing environment, a motivating environment. She has to stand in the classroom, bend, you know, take questions, answer questions. She has to grade the students. So it does require a lot of concentration, patience, it requires effective verbal communication, so it is—it is quite a hard job for somebody who has pain all the time, to maintain all of this every single day at the job.

Dr. Nanavati further testified she had never seen petitioner exaggerate or magnify her symptoms. She concluded, to a reasonable degree of medical certainty and probability:

[Petitioner] has chronic, which means a long-term, ongoing pain, [in] multiple parts of her body, related to fibromyalgia, ongoing neck pain in spite of surgery, in spite of multiple interventions, in spite of painkillers, muscle relaxers, as well as mixed headaches, ongoing. So this would impact her ability to perform her duty as a teacher and this would be permanent. It's been there for so long. It's not going to reverse. I don't think she's going to be able to perform. At that time, I made that

7

impression that she cannot perform the duties of a
teacher with that much pain and mental distress.

On March 2, 2018, Dr. Steven Lomazow performed an independent medical examination (IME) of petitioner, two months prior to her neck fusion surgery. He reviewed petitioner's medical records, took her medical history as she provided it, and performed a neurological examination that lasted about twenty to thirty minutes.

Dr. Lomazow also testified at the OAL hearing as an expert in neurology. He found petitioner had "significant facet disease of the cervical spine," and "tender points in the cervical spine and upper back and diminished range of motion and tenderness over the lateral aspect of the cervical spine."

Although petitioner's former and present treating physicians concurred she had fibromyalgia, Dr. Lomazow testified that he did not feel the diagnosis was credible. He explained that fibromyalgia is a diagnosis accepted by the American Academy of Rheumatology but not by the Academy of Neurology. Despite the fact that he considered it a "wastebasket" diagnosis for unexplained pain, he diagnosed patients with fibromyalgia when he was unable to find any other reason for their pain. As to petitioner, Dr. Lomazow's only diagnosis from a neurological standpoint was migraine headaches but he, like Dr. Nanavati, was

8

skeptical that they were actually migraine, instead attributing the headaches to her cervical pain and medication overuse.

Dr. Lomazow considered petitioner's complaints to be subjective because they could not be corroborated by test results or examination findings. He noted that no objective test verified radiculopathy, which is a compressed or pinched nerve. He further testified:

> Her complaints were purely subjective at that—at this time. Not to say that—that they didn't exist. I mean pain is a sub—it's total—all pain is subjective. You know, when a—when a woman['s] . . . belly starts getting larger over nine months and then she starts crying out in pain after nine months on a regular basis, and then a baby pops out, we know that this pain is real but it's all subjective there's no way of proving they're in pain. So, pain is a subjective . . . symptom.

Dr. Lomazow also addressed Dr. Nanavati's findings. He opined that petitioner's neck issues were not disabling and that the diagnosis of cervical radiculopathy was not based on any objective evidence because her electromyographic studies were normal. He acknowledged that petitioner had cervical muscle spasms and headaches, but disagreed with the diagnosis that they were chronic migraines. He noted that "anybody over the age of fifty" has an abnormal MRI of the cervical spine because of degeneration, and although

9

he found petitioner's to be "more severe than the average" he opined they were not "in and of themselves disabling."

As to petitioner's fusion surgery, Dr. Lomazow believed it was unnecessary: "If you want to know the rationale for the surgery, you'll have to ask the surgeon. My opinion was it wasn't necessary, but . . . [an] orthopedist['s] last name is surgeon so they find lots of reasons to do their job." He also found issues with the positive outcome of the surgery, deeming it to be a "transient benefit" from petitioner's wearing a hard cervical collar post-surgery. He likewise took issue with her Botox treatment, citing a "placebo rate" of forty percent; meaning that if one hundred people were injected, forty percent would "get better" even if they had been injected with saline.

While Dr. Lomazow did not believe petitioner was "making it up" and acknowledged that headaches "can be debilitating," he did not believe they were debilitating for petitioner because there was no objective evidence to support that finding.

Dr. Lomazow explained the limitations of his opinion:

> Well, basically since my job is to determine disability based on objective findings, and there were none from a neurological standpoint, then I felt that within a reasonable degree of medical probability from a neurological standpoint, [petitioner] was not totally and

A-2136-21

permanently disabled from her ability to perform her job as an English teacher.

He further acknowledged that petitioner may in fact be totally and permanently disabled based on the totality of her complaints, but not from a purely neurological perspective.

In February 2021, Dr. Lomazow reviewed additional information, including neurological notes from surgery, procedure notes from treating physicians, and results from MRIs, x-rays and an ultrasound, and wrote an addendum to his report indicating that none of the information impacted his opinion.

Petitioner testified at the OAL hearing that she had suffered with headaches for thirty-five years. During the 2017-2018 school year, she was assigned to teach five different English classes in five different classrooms. She was required to do "prolonged standing, prolonged sitting" and had difficulty reading essays on the computer because the font type and the sitting "bothered her." She experienced daily neck pain that resulted in tingling and numbness in her extremities and gave her "brain fog." She had difficulty remembering what students' needs were and resorted to making lists to remember. She still suffered from anxiety, depression and nightly insomnia for which she was treating with a psychiatrist.

11

Petitioner testified that after the neck fusion surgery, she obtained some relief but the "recovery didn't go as smoothly as possible" and the pain, numbness and tingling returned.

On December 1, 2021, the ALJ rendered her initial decision. She found both physicians to be well-qualified, credible experts who testified as to their respective opinions to an acceptable degree of medical certainty. She noted Dr. Lomazow's conclusion that petitioner was not disabled was based primarily on a lack of objective clinical findings to support petitioner's subjective complaints of pain and headaches. His opinion was also limited to his area of expertise, which was neurology, and "acknowledged that other specialists might find her disabled based upon their own specialty."

In contrast, the ALJ noted Dr. Nanavati's diagnosis and conclusions were more in-depth and supported by her treatment notes since 2015. The ALJ found her testimony to be detailed, credible and consistent with the offered evidence. The ALJ also noted Dr. Nanavati had been petitioner's treating physician, whereas Dr. Lomazow only saw her on one occasion. Because Dr. Nanavati had an ongoing treatment relationship with petitioner, the ALJ concluded that Dr. Nanavati was "in the best position to know the nature, extent and permanency

12

of all her complaints." Therefore, the ALJ gave greater weight to Dr. Nanavati's testimony.

The ALJ found:

> The totality of the credible evidence demonstrates that [petitioner] is unable to do the activities that are necessary to perform her job as a teacher that required her to move between five different classrooms throughout the building, walking up and down stairs, and sitting and/or standing for prolonged periods of time. The credible testimony supports that [petitioner's] constant neck pain that led to tingling and numbness in her arms and legs and "brain fog" as well as headaches adversely impacted her ability to effectively engage in the demanding duties required by her position and precludes her from performing those duties.

Accordingly, the ALJ found petitioner had established by preponderance of the credible evidence that she was incapacitated from the performance of her duty as a teacher, physically incapable of performing the material and general duties of a teacher, and permanently and totally incapacitated and disabled from the performance of her regular and assigned job duties as a result of her medical conditions.

On February 4, 2022, the Board issued its final decision, in which it modified the ALJ's findings of fact, rejected her finding that Dr. Nanavati's

13

testimony should be afforded greater weight than Dr. Lomazow's, and rejected her determination that petitioner is entitled to ODR benefits.

First, the Board explained its reasons for rejecting the determination that petitioner is entitled to ODR benefits:

> With respect to [petitioner's] job requirements, the [ALJ] found that [petitioner] is unable to do the activities that are necessary to perform her job as a teacher that required her to move between five different classrooms throughout the building, walking up and down stairs, and sitting and/or standing for prolonged periods of time. . . . The Board voted to reject this finding because it conflates how [petitioner] subjectively and specifically taught with the general requirements of being a teacher.
>
> . . . .
>
> The Board finds that based on [petitioner's] job description and the expert medical testimony and evidence in the record there is no reason why she could not perform the general functions of a teacher, which involves planning lessons and verbally communicating with students.
>
> Although [petitioner] alleged she is disabled because she experienced some difficulty with specific aspects of her job, such as moving[,] walking up and down stairs and moving in between classrooms, such difficulties do not meet the standard for [ODR].
>
> . . . .
>
> Moreover, these specific complications might have been resolved by simply requesting an accommodation.

14

The Board also rejected the ALJ's determination that Dr. Nanavati's opinion was entitled to greater weight than Dr. Lomazow's opinion. The Board found that "Dr. Lomazow's opinion more reliably accounts for the objective evidence in the record and that [petitioner's] subjective complaints do not have a sufficient objective neurological basis." The Board noted petitioner's neurological examination and brain MRI were normal, and these objective tests were of greater importance than petitioner's subjective complaints. It also observed that the Botox treatments ease the migraines, and that petitioner had suffered with headaches for over three decades but was still able to fully perform her job duties. In contrast, the Board found Dr. Nanavati's opinion that petitioner is permanently disabled "is not supported by objective evidence, but was only based on [petitioner's] self-reported pain."

Finally, the Board found the ALJ failed to adequately weigh the fact petitioner was still working when she filed her application for ODR and when she was examined by Dr. Lomazow; in contrast, the Board found Dr. Nanavati's findings were based primarily on "treatment from 2012 and exams in September 2018." Accordingly, the Board denied petitioner's application for ODR.

II.

A member of TPAF is entitled to ordinary disability retirement benefits when the member "is physically or mentally incapacitated for the performance of duty and should be retired." N.J.S.A. 18A:66-39(b). "The applicant for ordinary disability retirement benefits has the burden to prove that he or she has a disabling condition and must produce expert evidence to sustain this burden." Bueno v. Bd. of Trs., Teachers' Pension & Annuity Fund, 404 N.J. Super. 119, 126 (App. Div. 2008); see also Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 50-51 (2008).

Our review of decisions by administrative agencies is limited, with petitioners carrying a substantial burden of persuasion. In re Stallworth, 208 N.J. 182, 194 (2011). An agency's determination must be sustained "'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28, (2007)). "[I]f substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result . . . .'" In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

16

While we are not bound by an agency's interpretation of legal issues, which we review de novo, Russo, 206 N.J. at 27, "[w]e must give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible." Piatt v. Bd. of Trs., Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 13 (2005)). "Such deference has been specifically extended to state agencies that administer pension statutes." Id. at 99.

In addition, an agency may reject and modify an ALJ's initial decision, but its authority to do so is limited. Specifically, regulations require that when an agency rejects an ALJ's decision, it must clearly state the basis for that rejection and it must cite specific evidence supporting the agency's final decision and interpretation of the law. N.J.A.C. 1:1-18.6(b). The Board's discretion includes the authority to adopt, reject or modify the ALJ's findings of credibility of expert witnesses. In re Adoption of Amendments to Northeast, Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 584 (App. Div. 2014) (citing ZRB, LLC v. N.J. Dep't of Env't Prot., 403 N.J. Super. 531, 561 (App. Div. 2008)). However, the Board's findings cannot be arbitrary or unreasonable, and must be grounded in the record.

Here, the Board rejected the finding that petitioner "is unable to do the activities that are necessary to perform her job as a teacher that required her to move between five different classrooms throughout the building, walking up and down stairs, and sitting and/or standing for prolonged periods of time," because the ALJ's decision "conflate[d] how [petitioner] subjectively and specifically taught with the general requirements of being a teacher." As to this issue, the Board correctly identified the legal standard and rejected the finding that petitioner's limited ability to ambulate rendered her disabled. As the Board explained, petitioner could have requested an accommodation to address her difficulties in movement. On this point, we agree with the Board's determination that petitioner's difficulties in physically switching classes did not amount to a permanent disability.

However, the Board focused solely on that part of the ALJ's decision discussing movement between classrooms and ignored her finding as fact that petitioner's pain impacted her ability to remember things, prepare for class and instruct her students. The Board found, based on "expert medical testimony and evidence in the record[,] there is no reason why she could not perform the general functions of a teacher, which involves planning lessons and verbally communicating with students." In order to reach this conclusion, the Board

18

necessarily rejected Dr. Nanavati's expert testimony that she had reviewed the job description and determined that petitioner's headaches, fibromyalgia and neck pain rendered her unable to perform her job functions as a teacher. The Board found Dr. Lomazow's testimony more credible because it "more reliably accounts for the objective evidence contained in the record and that [petitioner's] subjective complaints do not have a sufficient objective neurological basis." It further found the ALJ erred by "minimizing the absence of clinical correlation between [petitioner's] complaints and diagnostic tests and Dr. Lomazow's hands-on testing."

The Board's decision is not supported by the record because it ignores both experts' concurring testimony that no objective test exists for fibromyalgia; unlike other diseases and conditions that are diagnosed through MRI, blood test or other objective means, fibromyalgia cannot be confirmed through any existing testing. Thus, it is not possible for petitioner to provide objective documentation of her diagnosis, and the fact that her neurological examination and brain MRI were normal is irrelevant to her longstanding fibromyalgia diagnosis.

In addition, we note Dr. Lomazow did not believe petitioner was feigning her pain or headaches but, based on his limited scope of evaluation, which was

19

constrained to a purely neurological perspective, found she was not disabled because of the lack of objective evidence verifying her pain. We reiterate that petitioner is unable to provide objective proof because no such test currently exists. Rather, she provided the requisite expert testimony of Dr. Nanavati, who detailed petitioner's longstanding fibromyalgia, neck pain and headaches which, despite multiple interventions of therapies, medications and surgery, remain unabated and render her permanently disabled and unable to perform her job duties as a teacher.

Reversed and remanded to the Board with direction to grant petitioner an ordinary disability retirement.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2136-21